ABKA LIMITED PARTNERSHIP, Plaintiff-Appellant-Petitioner,

v.

BOARD OF REVIEW OF the VILLAGE OF FONTANA-ON-GENEVA LAKE, Defendant-Respondent.

Supreme Court

*No. 98–0851. Oral argument September 8, 1999.—Decided December 23, 1999.*

(Also reported in 603 N.W.2d 217.)

For the plaintiff-appellant-petitioner there were briefs by *Alan Marcuvitz, Andrea Roschke* and *Weiss, Berzowski, Brady & Donahue, LLP*, Milwaukee and oral argument by *Alan Marcuvitz* and *Andrea H. Roschke.*

■■■■■■■■■■■■

■■■■

For the defendant-respondent there was a brief by *Robert Horowitz* and *Stafford, Rosenbaum, Rieser & Hansen*, Madison and oral argument by *Robert Horowitz*.

¶ 1. ANN WALSH BRADLEY, J. Plaintiff ABKA Limited Partnership (ABKA) seeks review of a published decision of the court of appeals that affirmed a circuit court order to uphold the 1996 and 1997 property tax assessments of the Abbey on Geneva Lake Resort.[1] ABKA contends that the assessments of the Board of Review of the Village of Fontana-on-Geneva Lake (Board) improperly included income from the management of separately owned off-site condominiums and incorporated erroneous data and methodology. We determine that the management income is "inextricably intertwined" with the resort property and that the assessor employed proper data and methodology. Because we conclude that assessments of the Board were made according to law and were supported by a reasonable view of the evidence, we affirm the court of appeals.

¶ 2. ABKA owns and manages the Abbey on Geneva Lake Resort (Abbey). In 1996, the Abbey was assessed at $8.5 million.[2] In his valuation of the resort

---

[1] *ABKA Ltd. Partnership v. Board of Review of the Village of Fontana-on-Geneva-Lake*, 224 Wis. 2d 551, 591 N.W.2d 879 (Ct. App. 1999) (affirming in part and reversing in part the judgment of the Circuit Court for Walworth County, James L. Carlson, Judge).

[2] Other assessments for the same year included:

Personal Property (owned by ABKA) - $1,789,900

Unsold dockominium units - $4,465,000

Sold dockominium units - $6,917,000

331

property, Assessor Fred Matthes included ABKA's income from the management of rental condominiums located adjacent to the resort. ABKA disputed neither the assessor's use of the income method to calculate the property assessment nor the capitalization rate he applied.[3] Instead, ABKA challenged the inclusion of the management fees in the assessment of the resort property.

¶ 3. ABKA does not own the condominiums located near the property. They are separately owned and assessed. Pursuant to annual rental agreements between ABKA and the condominium owners, however, ABKA receives 50% of the gross revenues from the rental of each unit. The owners retain the remaining 50%.

¶ 4. In return for its percentage of rental revenues, ABKA provides a myriad of services for the renters. Renters make reservations through the Abbey,

---

The unsold dockominium units are boat slips offered by ABKA for sale but which remain unsold.

[3] The income approach involves the conversion of anticipated future benefits into an estimate of the present worth of the property. Capitalization represents the conversion process. 1 *Property Assessment Manual for Wisconsin Assessors*, 9–7 (Rev. 12/94). This court has described the basics of the income method:

> "An assessor first determines the net annual income of the property. This figure is reached by deducting estimated operating expenses from the property's gross income. The assessor also selects a capitalization rate by considering the discount and recapture rates suitable for such an investment as well as the applicable effective tax rate. Finally the assessor applies a capitalization rate to the net annual income to yield the present value of the expected income stream over the life of the property."

*Waste Management of Wis., Inc. v. Kenosha County Bd. of Review*, 184 Wis. 2d 541, 561, 516 N.W.2d 695 (1994).

where they also check-in and check-out. Rental prices for the condominiums are advertised in the Abbey's brochures and are listed along with the rates for rooms in the Abbey. According to the terms of the rental agreements, ABKA retains sole discretion to set rental rates for the condominiums. In addition, the condominium renters have access to the full amenities of the resort, subject to the same additional charges as resort guests. The resort also provides advertising, individualized accounting, cleaning supplies and toiletries, and maid and switchboard services.

¶ 5. ABKA has managed the condominiums since 1978, and the management income from the rental of these condominiums accounts for over $300,000 of the resort's yearly revenue. Although not all of the condominium units participate in the rental pool, those units that do participate have provided a long-term, consistent pattern of rentals and a stabilized flow of income to the Abbey.

¶ 6. ABKA challenged the 1996 assessment before the Board on December 11, 1996. While testifying before the Board, both Assessor Fred Matthes and Frank Karth, ABKA's expert appraiser, addressed the propriety of including the management income in the assessment of the resort property. Matthes testified in support of the inclusion, while Karth testified that the fees represented intangible personal property that Matthes erroneously used to assess the resort property. ABKA also challenged the methodology that Matthes used in making the assessment, as well as his reliance on estimates rather than actual historical data. Finally, ABKA challenged the assessor's "rounding" of the assessed value from $8,328,025 to $8.5 million.

¶ 7. At the conclusion of the hearing, the Board decided to uphold the 1996 assessment. ABKA subsequently filed for certiorari review of the Board's determination. By that time, the 1997 assessment was also complete, and once again, the property was assessed at $8.5 million. The parties stipulated that the Board may make a determination as to the 1997 assessment based on the 1996 hearing record. Shortly thereafter, the Board upheld the 1997 assessment. In addition, the parties agreed to consolidate the certiorari actions for the 1996 and 1997 assessments.

¶ 8. Upon certiorari review, the circuit court affirmed the Board's decision finding both that the Board acted according to law and that its decision was based on a reasonable view of the evidence. The court of appeals subsequently affirmed the circuit court decision in part and reversed in part. The court held that the management income was "inextricably intertwined" with the resort property and thus was properly included in the assessment. Furthermore, the court determined that the assessor's methodology was proper, as was his reliance on estimates rather than actual historical data. However, the court disapproved of the assessor's decision to "round up" the final assessment and thus reversed and remanded with instructions to reduce the actual assessed value.[4]

I.

¶ 9. ABKA asks this court to review the Board's decision to uphold the assessment of its resort property. In a certiorari action under Wis. Stat. § 70.47(13) ·

---

[4] The issue of "rounding up" the value of the Abbey assessment was not raised before this court on appeal.

(1995–96),[5] our review of the Board's decision is "strictly limited." *State ex rel. Geipel v. City of Milwaukee*, 68 Wis. 2d 726, 731, 229 N.W.2d 585 (1975). This court considers the following factors: (1) whether the Board acted within its jurisdiction; (2) whether the Board acted according to law; (3) whether the Board's action was arbitrary, oppressive, or unreasonable, representing its will rather than its judgment; and (4) whether the evidence was such that the Board might reasonably make the order of determination in question. *Darcel, Inc. v. Manitowoc Bd. of Review*, 137 Wis. 2d 623, 626, 405 N.W.2d 344 (1987). In this case, the parties dispute whether the Board acted according to law and whether its determination was supported by a reasonable view of the evidence.

■■■

¶ 10. This court reviews the record of the Board independently of the determinations rendered by the circuit court and court of appeals, while benefiting from their analyses. *Steenberg v. Town of Oakfield*, 167 Wis. 2d 566, 571, 482 N.W.2d 326 (1992). If the assessment is made in accordance with the statutory mandate, it must be upheld if it can be supported by any reasonable view of the evidence. *Waste Management of Wis., Inc. v. Kenosha County Bd. of Review*, 184 Wis. 2d 541, 555, 516 N.W.2d 695 (1994). In determining whether there is enough evidence to sustain the assessment, "[t]he presumptions are all in favor of the rightful action of the Board." *Darcel*, 137 Wis. 2d at 626 (quoting *State ex rel. Boostrom v. Board of Review of the Town of Linn*, 42 Wis. 2d 149, 155, 166 N.W.2d 184 (1969)).

---

[5] All future references to the Wisconsin Statutes will be to the 1995–96 volumes.

¶ 11. We begin our analysis by examining the statutory basis for the assessment. Wisconsin Stat. § 70.03 defines "real property," "real estate," and "land" for the purposes of tax assessment as "not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto. . . ." Whether an income interest may be captured in a property assessment hinges on whether the value appertains to the property. A value that appertains to property is one that is transferable with the property. *State ex rel. N/S Assocs. v. Board of Review of the Village of Greendale*, 164 Wis. 2d 31, 54, 473 N.W.2d 554 (Ct. App. 1991).

¶ 12. At the heart of ABKA's argument lies its claim that, as business value, the management income from the rental of off-site condominiums was improperly assessed under the laws of this state. However, Wisconsin law recognizes that certain business value may be captured in a property assessment. *Waste Management*, 184 Wis. 2d at 564–65.

¶ 13. A determination of whether business value is assessable involves an inquiry into the income-producing capacity of the land. Income that is attributable to the land, rather than personal to the owner, is inextricably intertwined with the land and is thus transferable to future purchasers of the land. *N/S Assocs.*, 164 Wis. 2d at 54. This income may then be included in the land's assessment under Wis. Stat. § 70.03 because it appertains to the land.

¶ 14. In *N/S Associates*, the owner of a shopping mall challenged the assessment of the property, arguing that the assessor had improperly included business

value in the fair market value of the mall. 164 Wis. 2d at 52. In addressing the mall owner's argument, the court of appeals formulated a test for determining whether business value is to be included in a property assessment, and we adhere to that test today.

¶ 15. The *N/S Associates* court stated that the "key to the analysis" of whether business value is assessable "is whether the value is appended to the property, and is thus transferrable with the property, or whether it is, in effect, independent of the property so that the value either stays with the seller or dissipates upon sale." *Id.* at 54. Applying the test, the court found that the mall's sole reason for existence, the leasing of space to tenants, represented value that was "inextricably intertwined" with the mall and would survive its sale to a subsequent owner. *Id.* at 55. As part of its "transferrable income-producing capacity," the mall's business value was properly included in the mall's assessment. *Id.*

¶ 16. In *Waste Management*, the owner-operator of a sanitary landfill challenged a tax assessment that included the income generated by the landfill. 184 Wis. 2d at 545. The owner-operator claimed that the landfill income was business value that should not have been included in a property assessment. *Id.* In discussing *N/S Associates*, the court noted that the case:

> appears to recognize that certain business value may in fact be 'appended' to the real estate rather than personal to the owner. According to the reasoning of the court, such appended value is 'inextricably intertwined' with the land and is transferred to the new owner upon a sale of the land.

*Id.* at 564.

¶ 17. The *Waste Management* court found that the income generated by the landfill could be attributed to the underlying parcel of land, which had "an inherent capacity to accept waste." *Id.* at 568. The court also found that the inherent capacity would pass to a new owner upon sale. *Id.* As a result, it concluded that the board of review could have reasonably determined that the income generated by the landfill was "attributable to the transferable income-producing capacity of the underlying land itself," thus properly including the income in the assessment. *Id.* at 569.

¶ 18. While it is true that neither *N/S Associates* nor *Waste Management* is factually congruous to the situation presently before this court, both cases demonstrate the propriety of capturing business value in a property assessment when that value is inextricably intertwined with the underlying land. We must then determine whether the Board properly concluded that the management income at issue here is so inextricably intertwined with the land on which the Abbey is situated that it is transferable to future purchasers of the land.

¶ 19. Recognizing that the law provides for the inclusion of business value in a property assessment only if the value is inextricably intertwined with the property, the assessor in this case found ABKA's management income to be inextricably intertwined with the Abbey. The assessor testified that the condominiums, which are located next to the resort property, were developed by ABKA with the intention of providing a steady and available source of customers for the Abbey. This regular stream of customers provides a stabilized flow of income for the resort.

¶ 20. According to the assessor, the management income is attributable primarily to the nature of the

338

resort property, including the access to the Abbey's amenities and the advantage of the Abbey's location. The assessor explained that the Abbey's location serves as its main advantage. *See N/S Assocs.*, 164 Wis. 2d at 53 (property's value, for taxation purposes, affected by advantage or disadvantage of location). He indicated that the condominium renters are attracted both by the ability to make use of all of the resort's amenities and by the resort's lake setting. Moreover, these attractions are unlikely to dissipate upon sale to a different owner.

¶ 21. The assessor concluded, and the Board upheld, that ABKA's management income is a transferable value that will survive a sale of the Abbey. Wisconsin Stat. § 70.32 governs the valuation of property for tax assessment and requires that property be valued at its "full value."[6] "Full value" under § 70.32 is synonymous with "fair market value," which is the value reflected by an arms-length sale on the open market between "an owner willing but not obliged to sell and a buyer willing but not obliged to buy." *State ex rel. Mitchell Aero, Inc. v. Board of Review of City of Milwaukee*, 74 Wis. 2d 268, 277, 246 N.W.2d 521 (1976); 1 *Property Assessment Manual for Wisconsin Assessors*, 7–3 (Rev. 12/94). Since value is best fixed at what it would bring in an arms-length sale, the assessor was required to examine whether the contractual interest to garner management fees from the rental of the condominiums represented an element that a prospective

---

[6] Wisconsin Stat. § 70.32 states in relevant part:

"Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale."

buyer of the Abbey would be willing, and indeed expecting, to purchase. *N/S Assocs.*, 164 Wis. 2d at 53.

¶ 22. In a memorandum submitted as an exhibit before the Board, the assessor noted that the management income was included in an appraisal report prepared by ABKA for financing purposes, and it was also listed in ABKA's income statements. In his opinion, the listing of the management income was relevant because it indicated that the value of the Abbey included the management income and suggested that potential purchasers would be purchasing the ability to earn the income as well.

¶ 23. Furthermore, ABKA's own appraiser, Frank Karth, testified that most future purchasers of the Abbey would expect to acquire the management interest along with the Abbey property and would pay a greater sum accordingly. Thus, potential purchasers would recognize the value of the expectation of income from the management of the condominiums. It is the future or anticipated benefits that give value to the property. 1 *Property Assessment Manual for Wisconsin Assessors*, 7–3 (Rev. 12/94).

¶ 24. In addition, the rental agreements provide for assignment to third parties and successors, who become subject to the same terms and limitations contained in the agreement. Although the agreements are contractual in nature and expire yearly, they provide for automatic renewal at the end of the contractual period and have been renewed consistently for the past eighteen years. This history of renewal demonstrates the predictability of income from the rental of the condominiums and supports an expectation that this pattern is likely to continue.

¶ 25. ABKA maintains, however, that the income is not inextricably intertwined with the resort property

because ABKA's unique skill and expertise in management, rather than the nature of the resort property, allow it to earn the substantial income from the condominiums. While certain business value may be attributed to the transferable income-producing capacity of the underlying land, other business value that is attributable to the enterprise, skill, and acumen of the owner cannot be considered part of this transferable, income-producing capacity. *Waste Management*, 184 Wis. 2d at 565. A non-transferable use of property may not be considered an element of value for assessment purposes. *State ex rel. Oshkosh Country Club v. Petrick*, 172 Wis. 82, 84, 178 N.W. 251 (1920).

¶ 26. ABKA claims that another company or subsequent purchaser would not be able to emulate its success, for it is ABKA's superior business acumen that produces the revenues from the condominiums. ABKA errs in its reading of precedent. Whether business value may be included in a property assessment hinges on the property's inherent "income-producing *capacity*," a capacity that survives the sale of the underlying land, rather than on whether a subsequent owner succeeds in fully exploiting that capacity. *N/S Assocs.*, 164 Wis. 2d at 55 (emphasis added).

¶ 27. As long as the potential to produce income exists with the land and transfers to a subsequent owner, whether a subsequent owner of the Abbey is able to maintain the same level of management income as ABKA has historically maintained is not central to our concern. The relevance of a subsequent owner's success in maintaining the same level of income would be strictly limited to the specific amount included in the assessment. This amount may vary depending on

the ability to exploit the income-producing capacity that inherently exists with the Abbey property.

¶ 28. A competent level of management can be expected to reproduce the predicted income stream from the condominiums. Most entrepreneurs willing to participate in the competitive resort market are likely to possess the requisite business savvy and skills to provide clean linens, switchboard services, and help with reservations and check-in and check-out. The services offered by ABKA do not suggest any unique skill on the part of ABKA, but rather militate in favor of finding a unique quality of the land itself that attracts prospective condominium renters.

¶ 29. Moreover, there is evidence that the assessor did indeed factor out the amount he believed to be attributable to ABKA's own labor and skill in management. He did this by including appropriate management fees as an expense of the resort in the stabilized operating statement. The remainder was properly included in the assessment as income attributable to the Abbey property and not to any unique skill on ABKA's part.

¶ 30. ABKA further argues that because its management income is easily separated from income generated by the Abbey, unlike the business value of the mall in *N/S Associates*, it is not inextricably intertwined with the Abbey. Once again, ABKA misapprehends the test for determining whether a non-real estate interest may be captured under Wis. Stat. § 70.03. While the difficulty of separating the mall's business value was considered in *N/S Associates*, the issue of severability did not represent the dispositive factor. Rather, the fact that the income was non-severable helped buttress the court's conclusion that the income was inextricably intertwined with the

mall property. Here, the Board determined that the management income is inextricably intertwined with the resort property. The fact that it can be easily distinguished does not alter the outcome of our analysis.

¶ 31. ABKA also contends that assessable business value must be generated on the land, and that because its management income was generated from the off-site condominiums, it is not inextricably intertwined with the resort property. The court of appeals found ABKA's distinction to be an overly constrained reading of precedent, and we agree with this characterization. Wisconsin law does not create such an artificial distinction between on-site and off-site income. However, even assuming that the distinction carries a degree of significance, we are able to dismiss ABKA's contention by concluding that the management fees are generated primarily on the resort property itself.

¶ 32. We reiterate here that not only does the Abbey possess an inherent capacity to generate income due to its location and access to amenities, but that the Abbey also represents the actual site of income generation. The condominium rental fees are generated by the range of services and amenities provided on the resort grounds.

¶ 33. Furthermore, the assessor testified that the condominiums serve as extensions of the Abbey and, for all practical purposes, can be considered to be located on-site. The assessor found that the condominiums represent "an auxiliary set of overflow hotel rooms," an extension of the resort property with minimal expenses. While ABKA retains its half of the rental revenues, most of the costs are borne by the condominium owners, who pay taxes, maintenance, and insurance. The condominiums were developed by ABKA and, pursuant to the rental agreements, ABKA

retains sole discretion to set rental rates. Renters enjoy the same privileges and opportunities as resort guests and are not separately identified for revenue or expense purposes.

■

¶ 34. In summary, upon applying the test to determine whether business value may be included in a property tax assessment, we conclude today that ABKA's management income is inextricably intertwined with the Abbey. The management fees are generated both by and on the land on which the Abbey is located, and the ability to earn the fees is transferable to future purchasers of the Abbey. As value that is inextricably intertwined with the Abbey, the management income appertains to the Abbey under Wis. Stat. § 70.03 and was properly included in the Abbey assessment. We further conclude that the Board, in upholding the assessment, acted according to law and that its determination was supported by a reasonable view of the evidence.

¶ 35. Before proceeding further, we would like to sound a note of caution. Our determination today is not to be construed as a broad license to ignore the site of income and thus assess income derived from any off-site property that may have tenuous relationship to the main property being assessed. It is true that the off-site location of income lends itself to the initial conclusion that the income should not be encompassed in the assessment. However, where a factual exploration reveals a situation in which income is attributed primarily to the nature of the land being assessed, the significance of its off-site nature may lose potency.

¶ 36. We turn next to ABKA's claim that the assessor used incorrect data and methodology in making his valuation of the Abbey. First, ABKA submits that the assessor's data was erroneous because he relied on estimated figures, while ignoring the existence of actual figures. We reject ABKA's contention and find that the assessor's valuation was supported by a reasonable view of the evidence.

¶ 37. While testifying before the Board, the assessor explained that in making his assessment he first reviewed actual revenues and expenses. He then constructed a "stabilized operating statement." A stabilized operating statement examines operating history, eliminates anomalies in the flow of income, and projects stabilized income and expense levels for the future.

¶ 38. In explaining why he did not use the actual administrative and general expenses for 1994 and 1995 in making the assessment, the assessor testified that the actual expenses were largely in excess of those expenses for similar properties. The same was true of repair expenses, which he reasoned was a result of remodeling projects that would be "capitalized out" over a period of years.

¶ 39. The assessor also explained why he attributed more income to the property for marina fuel sales, when the sales had dropped the previous year. He noted that the previous year was the year that dockominiums were beginning to be sold, and as a result, the marina income was lower than normal. He did not believe the previous year's figure accurately reflected the income, and thus he used the income from the last year the marina was fully occupied.

¶ 40. In calculating an assessment, an assessor is required to make a determination "from actual view or from the best information that the assessor may practicably obtain." Wis. Stat. § 70.32. While the statute specifically mandates the use of recent sales as the "best information," there is nothing that suggests that an assessor must always use actual figures in the absence of a sale. Although an assessor should consider actual figures, we find no blanket rule mandating the use of actual figures as the data for an assessment when actual figures do not accurately reflect regular expenses.

¶ 41. In *Rosen v. City of Milwaukee*, 72 Wis. 2d 653, 242 N.W.2d 681 (1976), this court disapproved the assessor's use of estimated figures because it found the actual figures to be more reliable. This court examined actual construction costs and costs of land, instead of relying on estimated replacement costs, and noted that recent and undisputed market cost figures were preferable to any other "factor, theory, or rule of thumb." *Id.* at 669 (quoting *State ex rel. Garton Toy Co. v. Mosel*, 32 Wis. 2d 253, 261, 145 N.W.2d 129 (1966)). Notwithstanding its stated preference for actual figures, the court stopped short of declaring a mandate for the use of actual figures as data for a property assessment. The court instead disapproved of the board's failure even to consider actual figures. *Id. See also Marina Fontana v. Village of Fontana-on-Geneva Lake*, 107 Wis. 2d 226, 231, 319 N.W.2d 900 (Ct. App. 1982) (failure to consider actual costs grounds for invalidating assessment based on estimated costs).

¶ 42. In contrast, the assessor here did consider actual figures before he arrived at the figures in his stabilized operating statement. He did not wholly

346

ignore the actual figures, but rather thought that they did not represent the "best information" available. His explanation for using estimates as data for the assessment was reasonable in light of his knowledge and familiarity with comparable properties.[7]

¶ 43. Next, ABKA challenges the assessor's methodology. His methodology included first valuing the resort property as a whole based on ABKA's total gross revenues. The assessor then subtracted component parts from the whole, including personal property and dockominium values, to arrive at the final assessable value of the Abbey. ABKA offers only *State ex rel. Gisholt Mach. Co. v. Norsman*, 168 Wis. 442, 448–49, 169 N.W. 429 (1919), and argues that this court disapproved of the same "inverse" method of assessment used by the assessor in this case. ABKA's reliance on *Gisholt* is misplaced because it did not involve the income method of valuation.

¶ 44. Furthermore, we find nothing in the *Property Assessment Manual* that suggests that the

---

[7] ABKA cites several cases that fail to support its argument that an assessor must always rely on actual figures in the valuation of property. In *State ex rel. Park Plaza Shopping Ctr., Inc. v. Board of Review of City of Madison*, 61 Wis. 2d 469, 476, 213 N.W. 2d 27 (1973), this court did not require the use of actual figures over estimates, but simply noted that it was not erroneous for an assessor to use actual figures. *Darcel, Inc. v. City of Manitowoc Bd. of Review*, 137 Wis. 2d 623, 640, 405 N.W.2d 344 (1987), involved a recent arms-length sale of property, which under the statute represents the "best information" for tax assessment purposes. In *Metropolitan Holding Co. v. Board of Review of City of Milwaukee*, 173 Wis. 2d 626, 631, 495 N.W.2d 314 (1993), the use of estimated rents was not allowed in an assessment of property encumbered by HUD restrictions. No such encumbrances affect the Abbey.

assessor's method was improper. The party challenging a property assessment must show why its method of valuation is more reliable or accurate than the assessor's chosen method. *State ex rel. Park Plaza Shopping Ctr., Inc. v. Board of Review for the City of Madison*, 61 Wis. 2d 469, 476–77, 213 N.W.2d 27 (1973). ABKA has failed to convince us that the assessor's methodology was erroneous and has failed to offer a more reliable method of valuation.

¶ 45. ABKA also claims that by including the management income in the Abbey's assessment, the assessor violated this state's unitary tax rule, which requires that all property be assessed to its owner. *Aberg v. Moe*, 198 Wis. 349, 359, 224 N.W. 132 (1929). ABKA argues that the assessor took some of the income of the condominiums and improperly transferred it to the resort. ABKA's argument misses a critical point.

¶ 46. The assessor testified that in the Abbey assessment, he included only the 50% of the income that duly belonged to ABKA as management income under the terms of the agreements. The remaining 50% was attributed to the condominium owners. Thus, there was no transfer of condominium income to the Abbey.

■

¶ 47. Moreover, the management income is not an interest in the real property of the condominiums. Rather, it represents a contractual obligation of the condominium owners. We have already determined that the management income is generated by the resort property and is properly assessed as interest transferable with the property.[8] Accordingly, we reject ABKA's

---

[8] ABKA misplaces reliance on cases in which the interests involved attach to the underlying land. *See First Nat. Bank v. Charles Henneman Co.*, 10 Wis. 2d 260, 103 N.W.2d 24 (1960)

argument that the inclusion of the management income in the Abbey's assessment violates the unitary tax rule.[9]

¶ 48. In summary, we determine that ABKA's management income from the rental of condominiums was properly included in the assessment of the Abbey. The management income is inextricably intertwined with the resort property and is transferable to future owners of the Abbey. It thus appertains to the resort property under Wis. Stat. § 70.03. The assessor followed his statutory mandate and also employed proper data and methodology in his valuation. Because the 1996 and 1997 assessments of the Abbey were made according to law and were supported by a reasonable

---

(federal tax lien); *Aberg v. Moe*, 198 Wis. 349, 224 N.W. 132 (1929) (leasehold rights); *Schmidt v. Town of Almon*, 181 Wis. 244, 194 N.W. 168 (1923) (timber interests); *City of West Bend v. Continental IV Fund Ltd. Partnership*, 193 Wis. 2d 481, 535 N.W.2d 24 (Ct. App. 1995) (long-term lease); *Cornell Univ. v. Rusk County*, 166 Wis. 2d 811, 481 N.W.2d 485 (Ct. App. 1992) (mineral interests). These cases are factually distinguishable because, as we have already determined, the management income is value transferable with the resort property and not an interest in the real property of the condominiums.

[9] ABKA maintains that a violation of the unitary tax rule also constitutes double taxation, yet ABKA fails to develop its claim. This court will not address undeveloped arguments. *McEvoy v. Group Health Coop. of Eau Claire*, 213 Wis. 2d 507, 530 n.8, 570 N.W.2d 397 (1997).

In addition, ABKA raises the issue of violation of the uniformity clause for the first time during the present appeal. This court need not address arguments raised for the first time on appeal, and we exercise our discretion in declining to address ABKA's uniformity argument. *State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997); *State v. Wilks*, 121 Wis. 2d 93, 107, 358 N.W.2d 273 (1984).

view of the evidence, we conclude that the Board properly upheld the assessments. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 49. JON P. WILCOX, J. *(dissenting)*. Although I agree with the majority that the assessor's inverse methodology and his use of estimated figures are supported by a reasonable view of the evidence, I disagree with its conclusion that the fees received from management of off-site condominiums may be included in the assessment of the resort property.

¶ 50. Relying heavily on the concept that the management fees and the resort property are "inextricably intertwined," the majority fails to articulate clear guidelines for determining whether particular business income generated by an owner's contract with off-site property may be included in an assessment. The inclusion of such off-site income in an assessment has no precedent in Wisconsin case law and appears to have no basis in the Wisconsin Property Assessment Manual, other appraisal literature, or the case law of other jurisdictions. The resulting assessment involves the taxation of an intangible personal property interest, business income that does not "appertain to" the real property. Because I conclude that the assessment is therefore contrary to Wis. Stats. §§ 70.03, 70.112(1), and 70.32(1), results in double taxation, and undermines the Uniformity Clause of the Wisconsin Constitution, I respectfully dissent.

¶ 51. I agree with the majority that the scope of our certiorari review of the Board's action is narrowly limited. Majority opinion at 334; *State ex. rel Geipel v.*

*City of Milwaukee*, 68 Wis. 2d 726, 731, 229 N.W.2d 585 (1975); *Darcel, Inc. v. Manitowoc Bd. of Review*, 137 Wis. 2d 623, 626, 405 N.W.2d 344 (1987). However, as the majority acknowledges, one of the explicit grounds of our review is "whether the Board acted according to law." Majority opinion at 335; *Geipel*, 68 Wis. 2d at 731; *Darcel*, 137 Wis. 2d at 626. Although the Board's view of the evidence is reviewed with great deference, "the court may determine whether the assessment was made on the statutory basis, for such inquiry involves a question of law." *Geipel*, 68 Wis. 2d at 732 (citations omitted). Indeed, both of the cases the majority cites in support of the "strictly limited" standard of review rejected Board-approved assessments after determining that they were not in accordance with the law. *See id.* at 733–34, 737; *Darcel*, 137 Wis. 2d at 624.

¶ 52. Any approach to assessment of real property for taxation purposes first must conform to the statutory framework authorizing taxation. Taxes are to be levied upon all general property that is not exempt, including non-exempt real property. Wis. Stat. §§ 70.01, 70.02. "Real property" includes the land itself, all improvements on the land, and "all fixtures and rights and privileges appertaining thereto. . . ." Wis. Stat. § 70.03. However, it cannot include intangible personal property, which is specifically exempted from taxation. Wis. Stat. § 70.112(1). Assessors are to value real property at its full fair market value, in accordance with the Wisconsin Property Assessment Manual and professionally accepted appraisal practices. Wis. Stat. §§ 70.32(1), 73.03(2a).

¶ 53. We have always recognized that under these statutes an assessor must take care to value the real estate, and not the business concern using the real estate, in an assessment. *Waste Management of Wis.,*

*Inc. v. Kenosha County Bd. of Review*, 184 Wis. 2d 541, 565, 516 N.W.2d 695 (1994). Other jurisdictions appear to be in general agreement that business value must be separated carefully from real estate value in property tax assessments.[1]

¶ 54. In assessing real property, assessors utilize three basic approaches: the sales comparison, cost, and income approaches. 1 *Property Assessment Manual for Wisconsin Assessors*, ch. 9, at 9–6. Of these, the "sales comparison approach," which looks to recent arm's-length sales of the assessed property or comparable properties, is preferred because it most accurately reflects the property's fair market value. *Waste Management*, 184 Wis. 2d at 556–57; *Bischoff v. Appleton*, 81 Wis. 2d 612, 618–19, 260 N.W.2d 773 (1978). *See also* Wis. Stat. § 70.32(1)(directing assessors to first consider recent sales of the property and comparable properties, and then other factors affecting the property's value) *and* 1 *Property Assessment Manual for Wisconsin Assessors*, ch. 9, at 9–6, 9–19 (recognizing that the sales comparison approach should be used if applicable, and that other approaches should be con-

---

[1] *See, e.g., Service America Corporation v. County of San Diego*, 19 Cal. Rptr. 2d 165, 171 (Cal. Ct. App. 1993); *New Haven Water Co. v. Bd. of Tax Review*, 422 A.2d 946, 951–52 (Conn. 1979); *Post-Newsweek Cable, Inc. v. Bd. of Review*, 497 N.W.2d 810, 816–17 (Iowa 1993); *Inner Harbor Marina of Baltimore, Inc. v. Supervisor of Assessments*, No. 6280, 1991 WL 322991, at 1 (Md. Tax Ct. May 13, 1991); *Coastal Eagle Point Oil Co. v. Westville Borough*, 13 N.J. Tax 242, 281–283 (N.J. Tax Ct. 1993); *Dublin Senior Community Ltd. Partnership v. Franklin County Bd. of Revision*, 687 N.E.2d 426, 430 (Ohio 1997); *Boise Cascade Corp. v. Dep't of Revenue*, 12 Or. Tax 263, 266–269 (Or. T.C. 1991).

sidered only in the absence of sales comparison information).

¶ 55. In sum, although the income approach is not the preferred method for valuing real estate, this court has permitted the approach to be used in the absence of comparable sales and in conformity with the Wisconsin Property Assessment Manual. *See Waste Management*, 184 Wis. 2d at 560.

¶ 56. However, no Wisconsin case has ever allowed a property tax assessment to capture income generated by separate, off-site property. Thus, although the majority states that "Wisconsin law does not create such an artificial distinction between on-site and off-site income," majority at 343, no previous Wisconsin case has even suggested that off-site income could properly be captured in an assessment.

¶ 57. Typically, the income approach is used to value income producing properties that generate rental income on site. The approach "can provide a somewhat comfortable fit when used to value the more common income producing properties such as industrial, office or apartment buildings, or shopping centers, uses which often involve long or medium term leases or tenancies, which generate 'rental income' for the owners." *Analogic Corp. v. Bd. of Assessors*, 700 N.E.2d 548, 553 (Mass. App. Ct. 1998).

¶ 58. In these more typical income approach assessments, the assessor estimates the property's income by estimating its market rent. The Wisconsin Property Assessment Manual often describes the income approach in terms of rental income. *See, e.g.*, 1 *Property Assessment Manual for Wisconsin Assessors*, ch. 7, 7–20, ("[The assessor calculates] an estimate of net income by deducting the appropriate expenses from an estimate of the market rent of the property."), *and*

ch. 9, 9–7 ("Potential gross income is the income that would be generated if a property was 100 percent occupied and receiving the market rent.").

¶ 59. Similarly, industry literature recognizes that "[t]he income to investment properties consists primarily of rent." The Appraisal Institute, *The Appraisal of Real Estate* 478 (11th ed. 1996). In the past, this court has approved the inclusion of on-site income in assessing the fair market value of rental property. *See State ex. rel N/S Assocs. v. Bd. of Review*, 164 Wis. 2d 31, 52, 473 N.W.2d 554 (Ct. App. 1991); *Rosen v. Milwaukee*, 72 Wis. 2d 653, 670–71, 242 N.W.2d 681 (1976). Indeed, in this case ABKA agrees that the income derived from rental of rooms at the resort property was properly included in its assessment.

¶ 60. On-site rental income was essentially at issue in *N/S Associates*, the case that first used the phrase "inextricably intertwined" on which the majority opinion so heavily relies. In that case, the owner of a shopping mall challenged the use of a recent sale as an estimate of the mall's fair market value on the grounds that the sale price included business value. *N/S Assocs.*, 164 Wis. 2d at 52. Obviously mindful of the fact that a recent arm's-length sale is the best information for an assessment, *see id.* at 56–57, the court of appeals held that the assessment's reliance on the recent sale was permissible, even though it might include some business value. *Id.* at 55. Because "the leasing of space to tenants and related activities" was a value that would transfer with the mall at sale, it was "inextricably intertwined" with the mall. *Id.*

¶ 61. In contrast, the management fees at issue in this case are not generated by the rental of the assessed property and are easily separated from the

on-site rental income. The fees are generated by the owner's contracts to manage the rental of the off-site condominiums. There appears to be no precedent for including such income in a property tax assessment, and the majority cites nothing in the Wisconsin Property Assessment Manual or other appraisal industry authorities that explicitly justifies its approval of such an assessment.

¶ 62. Moreover, the majority seems to give the phrase "inextricably intertwined" a different meaning than it had in *N/S Associates*, and a different meaning than it is normally understood to have. A common definition of "inextricable" is "[d]ifficult or impossible to disentangle or untie." *The American Heritage Dictionary of the English Language* 924 (3d ed. 1992). "Intertwine" means "[t]o join or become joined by twining together." *Id.* at 944. Thus, to say that something is "inextricably intertwined" normally means that it is joined together and impossible to disentangle. The income at issue in *N/S Associates* actually was "inextricably intertwined" with the assessed property because, as the court noted, "there was substantial evidence before the Board of Review that it was not possible to separate Southridge mall's non-transferrable income-producing capacity from the elements of real estate that are set out in section 70.03. . . ." *N/S Assocs.*, 164 Wis. 2d at 55.

¶ 63. Notwithstanding the usual meaning of the phrase "inextricably intertwined," the majority determines that "the issue of severability did not represent the dispositive factor" in *N/S Associates*. Majority at 342. The opinion further explains that the easy severability of ABKA's management fee income from the income of the resort property itself simply "does not alter the outcome" of its analysis of whether the income

355

is "inextricably intertwined" with the resort property. Majority at 342.

¶ 64. Thus, in the majority opinion, the phrase "inextricably intertwined" does not seem to have its normal dictionary definition or the definition it had in *N/S Associates* itself. The precise meaning of the phrase is therefore obscure and will generate uncertainty in property tax assessments throughout the state.

¶ 65. To justify its decision that the off-site management fees are "inextricably intertwined" with the resort property, the majority relies on its conclusions that the income generated by the fees is a transferable value, majority at 338–40, and is "generated primarily on the resort property itself." Majority at 343.

¶ 66. To begin with, the idea that the income is a "transferable value that will survive a sale of the Abbey," majority at 339, appears to be unsupported by the record. ABKA, the owner of the resort, receives the income under one-year contracts with the individual condominium owners. Although the record establishes that, on average, 20 to 30 owners have contracted for ABKA's management services each year, there is no evidence that the same owners consistently renew their contracts, and the owners are under no obligation to do so. An owner's decision whether to renew a particular contract is likely to be greatly affected by his or her satisfaction with the quality of the services provided. Thus, nothing in the record suggests ABKA's management income would automatically transfer with the assessed resort upon sale.[2] This stands in contrast to

---

[2] The majority supports its conclusion that the management income is a transferable value that will survive the sale of the Abbey by relying on the testimony of ABKA's appraiser, Frank Karth, that future purchasers of the resort would expect

the income generated by renting mall space in *N/S Associates*, which was the mall's *"raison d'etre," N/S Assocs.* at 55, and would obviously transfer with the mall itself.

¶ 67. Likewise, the majority's conclusion that "[t]he condominium rental fees are generated by the range of services and amenities provided on the resort grounds," majority at 343, does not appear to be supported by the record. In reaching its conclusion, the majority is persuaded by the fact that "the condominiums serve as extensions of the Abbey," and "[r]enters enjoy the same privileges and opportunities as resort guests and are not separately identified for revenue or expense purposes." Majority at 343.

¶ 68. These facts do not seem relevant to determining whether the condominium management fees appertain to the resort property. The fact that renters may not be aware that the condominiums are actually separate properties does not change the fact that they *are* separately owned and separately assessed. The renters may indeed be attracted by the amenities available at the resort property, just as they are attracted by the nearby lake. However, any member of the public may also make use of the resort property's amenities, on a fee-for-service basis. The condominium renters pay the same fees for the use of those facilities, and those fees have already been taken into account in the

---

to acquire the interest in managing the condominiums. Majority at 340. However, Karth's testimony did not suggest that the management income is "impossible to disentangle" from the resort property or would transfer automatically with it. To the contrary, Karth testified that in order to transform his valuation of the resort as a "going concern" into a valuation of the property itself for tax assessment purposes, he extracted the value of the management income.

357

assessment. Thus, the additional income generated by the condominium renters' use of the amenities at the resort property are already included in the assessment, before the fees ABKA receives for managing the condominiums are added.

¶ 69. It seems clear that, rather than being generated by the resort property, the management fee income is generated by the condominium properties themselves. A person who rents a condominium pays the condominium owner primarily for the privilege of temporarily rooming *at the condominium*. In exchange for half of the rent paid to the condominium owner, ABKA provides services such as reservations, check-in, switchboard, and cleaning. Most of the services provided by ABKA could be managed from a building miles away from the condominiums. Thus, the management fees do not "appertain to" the resort property, but to the business that owns and operates the resort. They are not generated by the resort property, but by the rental of the separately owned, separately assessed condominium properties.

¶ 70. *Waste Management* also fails to support the majority's determination that the condominium management fees appertain to the resort property. That case was a great leap from our former precedents, none of which had permitted the inclusion of owner-operator income in a property tax assessment. The primary value of the landfill property at issue was its ability to receive waste. *Id.* at 568. We determined that a significant portion of the tipping fees generated on site was "attributable to the transferable income-producing capacity of the underlying land itself, and not to the labor and skill of the owner." *Id.* at 569.

¶ 71. Although the opinion concluded that there is no absolute bar to using owner-operator income to

value real estate, in the absence of rental income, *Waste Management*, 184 Wis. 2d at 563, it repeatedly emphasized caution and warned that its reasoning might only apply to the unique circumstances of a land-fill property. *Id.* at 569.

¶ 72. The majority opinion in this case is an even greater leap from precedent. The majority does not cite, and I am unable to find, any precedent in the case law of Wisconsin or other jurisdictions that supports the inclusion of income from management of off-site prop-erty in an income approach assessment. As noted above, there seems to be general agreement that even *on-site* business interests must be carefully separated from real property interests in property tax assess-ments. On the rare occasion that off-site income has been considered in a property tax assessment, the income has been generated by the activity of on-site residents. *See Knollcroft Apartments, Inc. v. Borough of Fair Lawn*, 3 N.J. Tax 25, 36 (N.J. Tax Ct. 1981)(allowing an apartment building's assessment to include half of the income from rental of parking spaces on an adjacent parking lot that the apartment owner used free of charge in exchange for maintaining the lot).

¶ 73. In particular, the decision to allow a prop-erty tax assessment of a hotel property to capture income generated by the owner-operator's contract to manage separate, off-site properties appears to be unprecedented. Indeed, cases reviewing income-approach assessment of hotels frequently have cau-tioned that the assessor must deduct non-realty value from the estimate of real property's net income. *See Analogic*, 700 N.E.2d at 553; *Equitable Life Assurance Soc'y/Marriott Hotels, Inc. v. State Tax Comm'n*, 852

S.W.2d 376, 380–81 (Mo. Ct. App. 1993). *Analogic* cautions that:

> Hotels present unique problems to appraisers. They tend to be labor intensive businesses which derive only a portion of their income from daily room (space) occupancies. They derive other income from services and sales of such items as food and alcohol. . . . This "other income," if not attributable to the realty, is not "rental income" for purposes of valuation under the income capitalization method.

*Analogic*, 700 N.E.2d at 553 (citation omitted). Similarly, as we noted in *Waste Management*, the Wisconsin Property Assessment Manual warns that for hotel properties, "the amount of income is substantially affected by the quality of management," and so "[t]he assessor should be careful to make sure that only the real estate is being valued and not the quality of management or goodwill." *Waste Management*, 184 Wis. 2d at 565 (citing 1 *Property Assessment Manual for Wisconsin Assessors*, ch. 9, at 9–24).

¶ 74. Moreover, nothing in the Wisconsin Property Assessment Manual provides that income like the management income in this case should be included in an income approach assessment. The manual states that miscellaneous, non-rental income may include "parking, coin operated laundries, and rental of clubhouses or party rooms," but cautions that any assessable items of personal property must not be double assessed. 1 *Property Assessment Manual for Wisconsin Assessors*, ch. 9, 9–10. This passage describes only income from operations on the property itself. Similarly, *The Appraisal of Real Estate* provides that "other income" includes:

all income generated by the operation of the real property that is not derived directly from space rental. It includes income from services supplied to the tenants such as switchboard service, antenna connections, and garage space; income from coin-operated equipment and parking fees is also included. Because service-derived income may or may not be attributable to the real property, an appraiser might find it inappropriate to include this income in the property's potential gross income. The appraiser may treat other income as business income or as real property income, depending on its source.

The Appraisal Institute, *The Appraisal of Real Estate* 489 (11th ed. 1996). It is true that under these principles, and as *Waste Management* holds, certain business income generated by the real estate may be included in an income approach assessment.

¶ 75. However, it does not follow from this that income generated by the owner-operator of a resort property under year-to-year contracts to manage the rental of adjacent condominiums should increase the resort property's tax assessment. Such income is easily distinguished from the income generated by the rental of the resort property itself. It is intangible personal property belonging to the owner of the resort and does not appertain to the resort property itself. Its inclusion in the assessment is therefore unlawful under Wis. Stats. §§ 70.03 and 70.32.

¶ 76. In addition to resulting in an inaccurate and unlawful calculation of the fair market value of real property, this assessment may violate Wisconsin's unitary taxation rule and result in double taxation. Under Wisconsin law, all real property must be assessed to its owner. Wis. Stat. § 70.17; *Aberg v. Moe*, 198 Wis. 349, 359, 224 N.W. 132 (1929). Each condo-

minium is assessed separately, and a fair market value assessment of each condominium would presumably include the value of the rental income. Nonetheless, the record shows that the assessor assessed part of this income to the resort property. The result may be that this portion of a condominium's value will be captured in two assessments, the assessment of the condominium and the assessment of the resort.

¶ 77. Finally, this assessment also appears to violate the Uniformity Clause of the Wisconsin Constitution. Article VIII, section 1 of the Constitution provides that "[t]he rule of taxation shall be uniform. . . ." The provision requires not "uniformity of methods of taxation, but uniformity in results. . . ." *State ex rel. La Follette v. Torphy*, 85 Wis. 2d 94, 109, 270 N.W.2d 187 (1978), *citing Chicago and N.W. Railway Co. v. State*, 128 Wis. 553, 614, 615, 108 N.W. 557 (1906). Yet, under the majority opinion, the amount of management income to be included in an assessment "may vary depending on the ability to exploit the income-producing capacity that inherently exists with the Abbey." This suggests that the assessment of the Abbey resort will not be uniform because the value of the resort in relation to other similar resort properties may vary depending upon the quality of management and the amount of entrepreneurial activity by each resort's owner. This is a serious undermining of the rule of uniformity in taxation required by the Wisconsin Constitution.

¶ 78. The majority opinion will have serious and far-reaching repercussions for property tax assessments across Wisconsin. The record shows that the property assessor in this case did not "specifically address" the Wisconsin property assessment manual and instead relied on interpretation of language in

*N/S Associates* and *Waste Management*. The language of the majority opinion invites even broader interpretation. The opinion repeats the inscrutable phrase "inextricably intertwined" seventeen times, yet never precisely articulates which analysis determines whether off-site business income appertains to real property.

¶ 79. In sum, although the majority opinion cautions that it is "not to be construed as a broad license to ignore the site of income and thus assess income derived from any off-site property that may have tenuous relationship to the main property being assessed," majority at 344, I believe that it approves just such an assessment. Because the resulting assessment is unlawful, I respectfully dissent.

¶ 80. I am authorized to state that Justice DAVID T. PROSSER joins in this dissenting opinion.