# COURT OF APPEALS
# DECISION
# DATED AND FILED

## August 30, 2023

Samuel A. Christensen
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP505**

**STATE OF WISCONSIN**

Cir. Ct. No. 2022ME320

## IN COURT OF APPEALS
## DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF C.H.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

C.H.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: TERESA S. BASILIERE, Judge. *Affirmed.*

¶1 LAZAR, J.[1] Charley[2] appeals from orders for his initial commitment under WIS. STAT. § 51.20(1)(am) and for the involuntary administration of medication under WIS. STAT. § 51.61(1)(g). Charley asserts that Winnebago County presented insufficient evidence to prove that he fell within one of the required statutory definitions of dangerousness. Thus, he contends, both orders must be reversed.

¶2 The County argues that the uncontroverted testimony of its two witnesses proves by clear and convincing evidence that Charley was, in fact, a danger to himself and to others and that his judgment was impaired sufficient to satisfy three of the statutory standards of dangerousness. Therefore, the County asserts this court should affirm the trial court's findings and orders.

¶3 This court concludes that sufficient evidence was presented to establish Charley's dangerousness under three standards. And, because this court affirms the trial court's commitment order, there is no basis to reverse the order for involuntary administration of medication. Both orders are affirmed.

## BACKGROUND

¶4 The County filed a petition requesting civil commitment and an involuntary medication order pursuant to WIS. STAT. ch. 51 on September 12, 2022. The County asserted that Charley, an inmate at the Wisconsin Resource

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] This court refers to the subject individual by a pseudonym pursuant to WIS. STAT. § 809.19(1)(g), to protect his confidentiality.

Center (WRC),[3] was mentally ill and exhibited a pattern of dangerous behavior. On October 13, 2022, the trial court conducted a contested hearing on the petition during which three witnesses, including Charley, testified.

¶5      First, the County called Tom Larson, a psychiatric care supervisor at the WRC. Larson testified about an incident in July 2022 when Charley refused to remove the mattress and wet toilet paper that he had used to cover the window to his cell, preventing the staff from completing visual wellness checks. Charley refused to respond at all to staff inquiries. Staff entered Charley's cell and "decentralize[d] him to the floor to maintain control" using an "incapacitating agent" (a skin irritant) known as oleoresin capsicum. Although Larson could not initially recall whether this resulted in injury to Charley, upon refreshing his recollection with a report he had authored at the time, he testified that Charley "did strike his head on the floor" and that an officer threatened to use a Taser so that Charley would "stop striking his head on the floor."

¶6      Next, Dr. George Monese, a staff psychiatrist at the WRC, testified. In his opinion, Charley "suffers from a major mental illness," namely catatonic type schizophrenia, that is treatable. He stated that Charley's judgment was so impaired that he engaged in behavior dangerous to others, and that is why he was transferred to the WRC from the Milwaukee Secure Detention Facility (MSDF). When admitted to the WRC, he was "catatonic, totally mute, [and] unresponsive," he further suffered from some episodes of "sudden excitement" that can include

---

[3] The WRC is "a correctional institution that provides psychological evaluations, specialized learning programs, training and supervision for inmates whose behavior presents a serious problem to themselves or others in state prisons." WIS. STAT. § 46.056. As the trial court noted, Charley is an "inmate in the Wisconsin State Prison System."

3

"violent outbursts for no reason." At one point, "he hit another person in MSDF," and in August 2022, "he threw a tray at somebody." Monese also stated that Charley "would be given food, but because he is so much in this psychotic state, he would simply stare at a tray and not eat …. He had lost significant weight." Monese opined that Charley's catatonia posed a danger to Charley himself because it could cause his muscles to break down or even lead to starvation and said that "[t]hat occurred a couple times" with Charley, but the medical team was not able "to assess how much damage" had been done because Charley would not consent to an exam.

¶7    Finally, Charley testified. He stated that he was willing to take some medicines, although he was not aware of what was prescribed for ADHD and thought he was taking a "[l]ower dose of—I think it was Benadryl or lorazepam, … basically using generic, over-the-counter" medicine for schizophrenia.

¶8    The trial court found that Charley had a mental illness and was "a danger because … of substantial probability of physical harm to himself and others." The court found the "more compelling" category of dangerousness in Charley's case to be danger to himself because in his unmedicated catatonic state he lost weight and there was concern about starvation. The court also noted that "the doctor indicated multiple acts" that form a "pattern" of dangerous acts. Ultimately, the court ordered an involuntary commitment of six months and that medication could be administered to Charley regardless of consent. Charley appeals, arguing that the evidence was insufficient to support the court's finding of dangerousness.

**DISCUSSION**

¶9      To issue a civil commitment order, trial courts must find by clear and convincing evidence that the subject individual is mentally ill, a proper subject for treatment, and dangerous to themselves or others under at least one of five statutory standards. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a)1.-2., (13)(e). This is critical, because "[i]t may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction." *Addington v. Texas*, 441 U.S. 418, 428 (1979). Courts must take special care in this area of law.

¶10      The review of a civil commitment order—determining whether the petitioner has met its burden of proof—presents a mixed question of law and fact. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A trial court's findings of fact are upheld unless they are clearly erroneous, *id.*, and appellate courts will "accept reasonable inferences from the facts." *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

## I.      Initial considerations

¶11      Before resolving the issue in this appeal, two matters must be addressed, and both involve the recent and unprecedented flood of appeals in mental commitment cases. First, several appeals could be avoided if the parties and court below take care to ensure that the record is well-defined and unequivocal with respect to which standard of dangerousness warrants the subject's commitment. Petitioners should clearly state in their pleadings and

argument which of the five standards applies. Both the subject individual and the court should be advised as to which of paragraph(s) a. through e. of WIS. STAT. § 51.20(1)(a)2. is at issue.

¶12     To the extent it is not clear, the trial court is encouraged to inquire under which statutory provision the petitioner is seeking commitment. Then, as the court issues its ruling, it should expressly state which statutory provision of dangerousness applies to the subject individual and summarize the relevant testimony and evidence that supports each statutory paragraph. The court should also make certain that its written order itemizes *each* paragraph that is relevant, as well as each ground upon which that statutory provision is manifested by the individual as contemplated by the new Order of Commitment forms.[4]  Moreover, counsel for the subject individual could be more involved and demand clarity on the statutory standard for dangerousness. These steps could clarify records and potentially avoid the need for a significant number of appeals.[5]  *See **D.K.**,* 390 Wis. 2d 50, ¶¶54-55 (explaining that while exact statutory language need not be parroted, testimony and findings should be linked to statutory standards and, in

_____

[4] *See* State Bar Form ME-911, 03/22 Order of Commitment/Extension of Commitment/Dismissal Order form. Paragraph 2B of that form requires the trial court to check which statutory standard of dangerousness under WIS. STAT. § 51.20(1)(a)2., or combined with § 51.20(1)(am) for recommitments, applies to the subject individual. It further requires that the court indicate the grounds and check how the dangerousness is "manifested or shown by" the individual. Those secondary boxes match up directly with the first four standards as set forth in § 51.20(1)(a)2.a.-d. For cases in which the fifth standard (§ 51.20(1)(a)2.e.) applies, courts are to use a separate order form:  the State Bar Form ME-914, 03/22 Order of Commitment/Extension of Commitment/Dismissal (Fifth Standard Under § 51.20(1)(a)2.e., WIS. STATS.) Order form.

[5] This court does not wish to criticize petitioners or trial courts; this area of the law typically involves hearings with less than a week's time to prepare and usually results in many cases stacked up on each hearing date. It is understandable why some records are less than clear or incomplete.

"speak[ing] to the bench and the bar," noting that "[t]aking more time at the [trial] court can save years of uncertainty on appeal.").

¶13     Second, while this court acknowledges that our supreme court has determined that mental commitment appeals are not moot based upon two (or possibly three) collateral consequences, *see Sauk County v. S.A.M.*, 2022 WI 46, 402 Wis. 2d 379, 975 N.W.2d 162, this court notes that in many cases such consequences are illusory.  For instance, the first consequence articulated in *S.A.M.* is that the subject individual is subject to a firearm prohibition.  *Id.*, ¶23. But, as noted in the concurrence/dissent to *S.A.M.*, that ban could be duplicative in some cases, effectively rendering *it* moot.  *Id.*, ¶¶41-43 (Ziegler, C.J., concurring in part and dissenting in part).  The individual in *S.A.M.* was already subject to a prior firearm ban from an initial commitment that had not been appealed, but the court reasoned that an additional ban could have a practical effect (albeit "marginal") if and when a future court considered restoration of gun rights.  *Id.*, ¶23.   However theoretically possible that effect might be, Charley's appeal presents a lesser "practical effect" because he is a prisoner of the state being housed in the WRC:  that means that he is likely a felon (misdemeanor offenders are not placed in prison), and, as such, he is already subject to a lifetime firearm prohibition.  *See* WIS. STAT. § 941.29.  Thus, the first collateral consequence may not be applicable in this appeal.

¶14     The second collateral consequence mentioned in *S.A.M.* is that a county may seek to recoup payments from the subject individual that it made to supply recovery care and medication.  402 Wis. 2d 379, ¶24; *see also* WIS. STAT. § 46.10(2).  In this case, as in many (if not most), the County has made no indication that it would seek such reimbursement.  Nor has Charley's counsel indicated that the County actually made a financial reimbursement demand.  And,

Charley's counsel has provided no legal authority by which a county is able to seek that type of recovery when the State Department of Corrections—and not a county—is the entity supplying treatment and medication.

¶15    The final possible collateral consequence—social stigma—is not asserted by Charley in this appeal.  Perhaps for good reason, since "no Wisconsin court has ever concluded that social stigma alone is a collateral consequence of commitment that will defeat the mootness doctrine."  *S.A.M.*, 402 Wis. 2d 379, ¶51 (Ziegler, C.J., concurring in part and dissenting in part).

¶16    As Chief Justice Ziegler presaged in her concurrence/dissent, "[w]ith no moot appeals in these [commitment] cases, the appellate system will be flooded."  *Id.*, ¶38.  And, flooded the system is.[6]  Appellate courts should carefully assess whether a potential collateral consequence truly exists in an expired commitment appeal.  Here, Charley is already subject to a firearm prohibition that is not in any way tied to his commitment.  And, he has presented no evidence that the County has any standing to seek to recover costs for his care at the WRC, nor that the County is even the entity that pays such costs in the first place.  It is his obligation to develop[7] his arguments, including a basis to have his appeal heard.  That being the case, and the fact that Charley's six-month commitment expired in

---

[6] One-judge appeals in the Wisconsin courts of appeals have increased from 413 in 2020 (when the first supreme court decision holding appeals of expired mental commitments are not moot was issued in *Marathon County v. D.K.*, 2020 WI 8, 390 Wis. 2d 50, 937 N.W.2d 901) to 564 in 2022 (the last report of appellate Case Load Statistics).  Wisconsin Court System, Court of Appeals Annual Reports (2020 and 2022), https://www.wicourts.gov/other/appeals/statistical.jsp.

[7] *See ABKA Ltd. P'ship v. Board of Rev.*, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) (appellate courts typically do not address undeveloped arguments).

April 2023—long before the first appellate brief was even filed—this court has serious doubts about whether his appeal is not moot.

¶17    Regardless of the potential lack of a viable, non-moot appeal, this court will still address the merits of this appeal.

### II.    Despite a lack of clarity about the relevant dangerousness standard, the trial court's finding of dangerousness was supported by sufficient evidence.

¶18    The County, in its appellate brief, now clearly identifies the statutory standards upon which it believes the trial court found Charley to be dangerous: paragraph b—"a substantial probability of physical harm to other individuals;" paragraph c—"a substantial probability of physical impairment or injury to himself … or other individuals" due to "such impaired judgment;" and paragraph d—"a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness."  WIS. STAT. § 51.20(1)(a)2.b.-d.  These findings were based upon the hearing testimony and are summarized below.

¶19    Monese testified that catatonia does not just implicate mute and nonresponsive behavior, but it can include "catatonic excitement."  Here, several examples of that excitement support the finding that Charley is dangerous because there is a substantial probability of physical harm to other individuals.  *See* WIS. STAT. § 51.20(1)(a)2.b.  Charley was transferred from MSDF due to his violent behavior there, including hitting another inmate.  Even at WRC, Charley threw a food tray at another person.  These actions were in the six months prior to the hearing—one even took place a month before the hearing.

¶20     Next, the trial court was most concerned about Charley's impaired judgment that had, in its view, a substantial probability of resulting in physical impairment or injury to Charley himself.  *See* WIS. STAT. § 51.20(1)(a)2.c.  The court found[8] that several of Charley's actions led it to conclude that he could harm himself.  Monese testified as to Charley's impaired judgment[9] in detail:

> Okay.  I'll start with a—with a—with the judgment.  His judgment was so impaired in many occasions that he would engage in behaviors that are a danger to others, and that is the main reason—that is one of the main reasons he was transferred to [the] Wisconsin Resource Center.  I reviewed the records from the previous institution, as at the time of admission he was so catatonic—so catatonic, totally mute, unresponsive.  I mean, verbally, fully awake, but not responding.  You know, just staring like that.
>
> ….
>
> And one of that information was in his medical records, pointing that prior to coming to [the] Wisconsin Resource Center as a referral, he engaged in behavior that was a danger to others, wherein he hit another person in MSDF.  I was aware of those and I tried to engage him in a conversation so that we can start appropriate treatment, but he wouldn't.  So that is one other aspect of lack of judgment at the time.

---

[8] This court does note that the trial court erred by not checking the box under the second part of paragraph 2B on the order of commitment to indicate that there was "a pattern of recent acts or omissions under §51.20(1)(a)2.c, Wis. Stats." to support the finding of dangerousness under that statutory provision.  That was a clerical error, and "the law is clear that a court has the power to correct clerical errors at any time."  *See State v. Prihoda*, 2000 WI 123, ¶17, 239 Wis. 2d 244, 618 N.W.2d 857.  Moreover, the trial court's failure to expressly check this box or more clearly state a finding on the record is not necessarily a basis for reversal if the record contains evidence that supports the court's oral ruling.  *See State v. Martwick*, 2000 WI 5, ¶31, 231 Wis. 2d 801, 604 N.W.2d 552 ("if a [trial] court fails to make a finding that exists in the record, an appellate court can assume that the [trial] court determined the fact in a manner that supports the [trial] court's ultimate decision.").  Here, that evidence is in the record.

[9] Both of these examples of impaired judgment also relate to dangerousness under paragraph b.  *See* WIS. STAT. § 51.20(1)(a)2.b.

¶21     Finally, the trial court heard and relied upon testimony that showed Charley required prompt and adequate treatment to avoid imminent serious physical injury or serious physical debilitation due to his recent behavior sufficient to satisfy the fourth standard of dangerousness under the statute. *See* WIS. STAT. § 51.20(1)(a)2.d. Larson testified that when staff entered Charley's cell, he had to be threatened with a Taser before he stopped striking his head on the floor. Monese testified that, due to Charley's catatonia, he would often not eat, had lost significant weight, and forbade physicians to conduct proper assessments to determine if there was ongoing or existing damage due to possible muscle breakdown and/or starvation. Monese further testified that Charley would just sit staring, mute and totally nonresponsive.

¶22     Charley's counsel argues that Monese's testimony that Charley had recently improved, was moved to a less restrictive environment within WRC, and had been eating on his own is proof that there are and were no concerns for Charley's physical well-being. To the contrary, those examples show the opposite. They evidence that, without the intervention of Monese and other staff, Charley was at substantial risk of serious physical injury or debilitation.

¶23     The trial court agreed, finding in its oral ruling that there were compelling concerns of danger to Charley personally. It explained that it relied upon Monese's testimony about Charley's catatonic state and how that "affects eating and, therefore, starvation; there is a loss of weight by [Charley], and concern over a breakdown of muscle due to the catatonic state." Due to that catatonia and accompanying weight loss, there was sufficient basis to conclude that Charley was at a substantial probability of serious harm to himself if left untreated.

11

¶24 Accordingly, there was sufficient evidence in the record for the trial court to find that the County had met its burden of proof with respect to each of these three standards of dangerousness. The court then looked to whether such dangerousness was based upon "a recent overt act, attempt or threat to do serious physical harm" (WIS. STAT. § 51.20(1)(a)2.b.), "a pattern of recent acts or omissions" (§ 51.20(1)(a)2.c.), or "recent acts" (§ 51.20(1)(a)2.d.). Concluding that Charley's acts of dangerousness were recent, the court checked off the appropriate boxes on the order and made the following finding on the record:

> Court does find that the testimony did include—I believe the doctor indicated multiple acts. And the catatonia that goes on from day-to-day, certainly an argument can be made that that is a pattern of acts.

That was adequate to establish that the court heard, considered, and found dangerousness for each of the three relevant standards in the testimony and evidence. It was not necessary that the court use "magic words" to link conduct to each standard. *See* *D.K.*, 390 Wis. 2d 50, ¶54. Taking the testimony as a whole and considering the court's findings, *see* *id.*, ¶51, there is sufficient evidence present in this case (albeit not carefully detailed and lined up as this court suggests be done in future cases) to support Charley's commitment and corresponding medication order.

## CONCLUSION

¶25 Based upon the foregoing, this court concludes that Winnebago County presented sufficient evidence to establish Charley was dangerous under three of the statutory standards. Accordingly, this court affirms the trial court's order committing Charley and the corresponding order for the involuntary administration of medication and treatment.

12

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.