COURT OF APPEALS
DECISION
DATED AND FILED

November 24, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP226-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015CF1159

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

　　PLAINTIFF-RESPONDENT,

　V.

JEFFREY L. HINEMAN,

　　DEFENDANT-APPELLANT.

　　　　　　APPEAL from a judgment and an order of the circuit court for Racine County:  MARK F. NIELSEN, Judge.  *Reversed and cause remanded for further proceedings.*

　　　　　　Before Gundrum, P.J., Neubauer and Reilly, JJ.

　　　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jeffrey L. Hineman appeals from a judgment of conviction, following a jury trial, for first-degree sexual assault of a child under the age of thirteen and from an order denying him postconviction relief. He asserts the State violated his due process rights pursuant to **Brady v. Maryland**, 373 U.S. 83 (1963), by failing to provide him with a March 12, 2015 child protective services (CPS) report prior to his trial.[1] Because we agree with Hineman, we reverse the circuit court's judgment and order and remand for further proceedings consistent with this decision.

¶2 Hineman also contends the circuit court erred in not ordering, postconviction, an in camera review of the child's counseling and therapy records pursuant to **Shiffra/Green**.[2] We agree with Hineman, but only to a limited extent.

## *Background*

¶3 Hineman was romantically involved with SJS's mother leading up to SJS's birth and remained involved in SJS's life until SJS moved out-of-state with his mother approximately one year later. A man named Frank was determined to be SJS's biological father, and SJS returned to Wisconsin and began residing with Frank some years later. With Frank's permission, Hineman reconnected with SJS and would take SJS places, care for him, and buy him gifts.

---

[1] Hineman seeks reversal and remand for a new trial on numerous additional bases as well. Because we reverse and remand based upon the **Brady v. Maryland**, 373 U.S. 83 (1963), violation, we need not address those other issues. *See **Barrows v. American Family Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

[2] **State v. Shiffra**, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993); **State v. Green**, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298.

2

¶4     On March 12, 2015, when SJS was six years old, SJS's therapist, who SJS was seeing because of behavior problems,[3] reported to CPS her concern that SJS could possibly be a victim of sexual abuse.  That same day, CPS prepared a report based upon the contact from the therapist.  The report states, among other things, that the therapist indicated to CPS that:  (1) at school the week prior, SJS was sucking up and down on a pen cap and "told a classmate [that it] 'feels good when someone sucks on your privates'"; (2) SJS told the therapist that he had "seen it in the movie Garfield 2"; and (3) SJS's dad, Frank, talked to SJS about this, and SJS "indicated that [Hineman] had told him."  The report also states that the therapist reported "that no information was given by [SJS] that [Hineman] had touched him or forced [him] to touch [Hineman]."  The closing portion of the March 12 report repeats "[t]here has been no disclosure of maltreatment by the child."  The therapist further reported that Frank cut off Hineman's contact with SJS two or three days before the March 12 report date.

¶5     Two subsequent CPS reports were created, one on April 20 and one on May 29, the first by a nurse and the second by a school teacher and a school counselor.  Neither of those reports give any indication that SJS himself reported any inappropriate touching or contact.  The March 12 CPS report was faxed to the Racine County Sheriff's Office on June 5, 2015, resulting in a criminal investigation of possible sexual abuse of SJS by Hineman.

¶6     On August 4, 2015, a Child Advocacy Center forensic interview was conducted, during which SJS expressed for the first time that Hineman had touched

---

[3] SJS's behavior problems included aggressiveness, "pulling his pants down in class and also at home … and acting as if he is going to defecate on the floor," and "just ripping his clothes off."

his "private parts" over his clothing. Following the interview, Hineman was charged with first-degree sexual assault of a child under the age of thirteen.

¶7 At trial, the State called four witnesses. A forensic interviewer testified first and essentially explained the nature and purpose of the August 4, 2015 videotaped interview of SJS. The video of the interview was then played for the jury.

¶8 During the interview, when asked if something happened to his body, SJS indicated that Hineman punched him in the arm and kicked him in the belly while they were watching television. SJS indicated that he told his dad, and his dad "kicked [Hineman] out." When asked if Hineman ever did anything else he did not like, SJS indicated that Hineman had touched his "private parts" over his clothes with his hand while laughing. SJS said he told Hineman to stop, but Hineman did not listen, and so SJS woke his mother and father and told them about it, despite Hineman instructing SJS not to tell anyone. SJS said his father "kicked [Hineman] out again."

¶9 As to the time of the year the touching had occurred, at one point, SJS indicated that he did not believe that the incident happened during the school year. At another point, SJS said it occurred during "winter time."

¶10 When asked if anyone else had ever touched his "privates," SJS responded, "No." When asked if "that kind of touching" by Hineman occurred only one time or more than one time, SJS first responded, "Four times," but when asked to give detail about another time "that the touching happened," SJS responded, "That was all." Later in the interview, SJS stated that Hineman touched his "privates" "six times on the couch."

4

¶11     Following the video, SJS testified.  When asked "[c]an you tell me about another time [other than a spanking incident to which SJS testified] that [Hineman] touched you, [and] you didn't like it?"  SJS responded, "I don't remember what he did but I know we were on the couch."  When asked "[w]hy didn't you feel right [when Hineman touched you]," SJS responded, "I *think* he touched me on my private part." (Emphasis added.)  He stated that nobody else was in the house at the time, the touching stopped because he "ran into [his] bedroom and closed the door," and nothing "happen[ed] after that."  When asked whether Hineman touched him "one time or more than one time," SJS responded, "Once," and he later confirmed again that that was "the only time [Hineman] touched [his] private parts."  SJS indicated that the touching occurred "the day right after trick-or-treating" and that he told his father and grandmother about it the same day it occurred.

¶12     Mary—Frank's mother and SJS's grandmother—testified next.  She testified that SJS never told her that Hineman had inappropriately touched him, and she indicated that if SJS had told her, she "definitely" would have "taken action."

¶13     The investigating sheriff's deputy on the case testified next.  She testified that she made contact with Hineman the day after SJS's August 4, 2015 forensic interview.  While at Hineman's residence with her squad car in the driveway, Hineman drove past his residence slowly.  A man living at the same location received a call from Hineman.  The investigator spoke with Hineman on the man's phone and asked Hineman to return to the residence.  Despite telling the investigator that he was "an hour away" and "would not be able to do so," Hineman returned to the residence "[w]ithin minutes."

¶14    The investigator interviewed Hineman at the sheriff's department, and Hineman expressed that "he cared for [SJS] like he was his son." Hineman explained that he had bought SJS his first bike, and if SJS had a good week at school, Hineman would buy him toys. Hineman had also set up a savings account for SJS and sent SJS a card with ten dollars in it on the Fourth of July.

¶15    Hineman acknowledged to the investigator that he had spent time alone with SJS when SJS's father, Frank, was in the hospital for two weeks. The investigator testified that Frank had been in the hospital from October 21 to October 31, 2014, and that Hineman informed her that he, Hineman, had taken SJS trick-or-treating during that time.

¶16    The investigator testified that when she spoke with Hineman about SJS's allegations, Hineman suggested that they may have been made because he "would not let Frank and Mary have access to the money in the savings account for [SJS]." The investigator testified, however, that Frank and Mary cut off contact with Hineman in March 2015 yet "were not made aware of any savings account until [Hineman] mailed them the Fourth of July card with the ten dollars and there was [an] explanation that there was a savings account for [SJS]." When the investigator explained to Hineman "how the timeline didn't fit" with the savings-account explanation, Hineman then suggested that, as the investigator phrased it, "the disclosure" probably was made "because he had stopped helping the family" so they "were going to try to get back at him." This explanation also raised a "red flag" as her investigation indicated that Hineman had contact with and was doing things for the family "up until the time that the disclosure was made." The investigator testified that the sheriff's department received the March 12, 2015 CPS report from CPS in June 2015, but "the initial disclosure" to CPS occurred on March 12, 2015.

¶17     The investigator testified that Hineman "portrayed himself as [if] he was like a savior to the entire family … doing all these things for [them]. He felt he had raised [SJS]. That he was the best father figure that [SJS] had."

¶18     On cross-examination, the investigator agreed that Hineman "was the father figure in [SJS's] life when he was born" and remained with SJS's mother thereafter, until SJS and his mother moved to another state. The investigator confirmed that at some point Hineman became aware that Mary, SJS's grandmother, had custody of SJS. Hineman told the investigator that he contacted Mary and indicated to her that he missed SJS "and wanted to be reintroduced into his life."

¶19     The investigator agreed that "after reviewing the CPS report," she created her own report. After having her memory refreshed on the witness stand with her own report, she agreed that her report "contain[ed] information regarding the CPS report that [she had] reviewed" and that her report "makes mention … that [SJS] was sucking on a pen at school. He did tell classmates that it feels good to have your privates sucked on."

¶20     The investigator conceded that when she "first met with Frank and Mary in July of 2015," "there was no mention" from either of them "that [Hineman] had inappropriately touched [SJS]." The investigator's testimony continued:

> [Defense Counsel:] And is [the August 4, 2015 forensic interview] the first time that [SJS] says that [Hineman] *touched his privates*?
>
> [Investigator:] I don't know if that's the first time [SJS] had said that. I know that was the first time that I had seen that. *But I believe in the [March 12] CPS report, that there was a statement in there that he said [Hineman] had done that.* But I would have to look at the original report that came from CPS.

[Defense Counsel:] Would that have been anywhere in your report … if there was *a mention that [Hineman] had inappropriately touched [SJS]*?

[Investigator:] I don't know if I documented *that*. Whether or not I would have to look at my report again, in my original narrative to see if I did indeed write *that* in there.

[Defense counsel:] But if you were told *that*, you would have then put *it* in your report?

[Investigator:] I would think I would have but it's not—I might have not put *it* in there but that's why I would have to look at the report and look at *the original CPS. I believe it does state that he later says that*.

(Emphasis added.)

¶21    The investigator agreed that she was present for SJS's forensic interview, during which SJS stated that after Hineman touched him, "he woke his parents up immediately and told them." When asked if she inquired of Mary (Frank's mother/SJS's grandmother) and Frank if [SJS] "had disclosed to them," the investigator responded, "I don't know if it specifically came up in a conversation." When shown a report she had written in the case and asked, "Now that report also contains information that you gathered from talking to Frank and Mary, right," the investigator responded, "A small section, yes." When asked "if [SJS's] dad [Frank] had told you that there was a disclosure to him, that's relevant [i]nformation. Right," the investigator responded, "[SJS's] father also has a brain trauma."[4] The investigator also stated that she did not "write anywhere in [the] report that Mary stated that [SJS] had disclosed to [her]."

---

[4] When the investigator spoke with Frank in June 2015, she learned that he had been treated for meningitis and had been diagnosed with brain cancer so "[t]he affects of that interrupted … his language sometimes and often it is more difficult for him to understand what you are saying and also to communicate."

8

¶22 On redirect examination, the investigator stated that it is "not uncommon for [children] not to know dates" of when sexual abuse occurred. "I have found in my personal experience that they remember times of the year. Like they will remember it was around when school began or it was around Christmastime, those types of things."

¶23 Hineman testified next. He stated that he was in a "romantic relationship" with SJS's mother before and after SJS's birth, and they began living together the day after SJS came home from the hospital. Hineman's relationship with SJS's mother ended approximately fourteen months later, but he continued to see SJS occasionally "[b]ecause … I was just like his father for fourteen months." Hineman and SJS's mother stayed in contact over the years—the mother would send Hineman photos of SJS, and Hineman would talk with SJS on the phone. In 2013, Hineman contacted Mary, SJS's grandmother, who had gained custody of SJS, to inquire as to how SJS was doing. Mary expressed that "she would love me to be a part of [SJS's] life. She wanted me to know that [SJS] kept my name. His first name is my middle name. She knew I cared for [SJS] and wanted to be a part of their life and family." Hineman bought birthday and Christmas presents for SJS, had contact with the family, and helped the family financially and with repairs. Hineman expressed that he "treat[ed] [SJS] as though he is my son."

¶24 When Frank was in the hospital with meningitis, around Halloween 2014, Mary asked Hineman if he could stay at the house to take care of SJS until Frank returned from the hospital. Hineman took two weeks off from work, stayed there, and took care of SJS. Hineman noticed a significant change in Frank when he came home from the hospital. "I figured because of the meningitis how it affected his brain or his memory and things.… I had spoke to Mary about things. That made them mad" and caused his relationship with Frank to change.

¶25    On March 10, 2015, Hineman took SJS to

> the Journal Sentinel sport show at State Fair Park.  Monday
> I was having cable put in for them … so [SJS] could have it
> for school.  Tuesday they were getting their furniture
> delivered.  They asked me to come over to see the new
> furniture they had bought.…  So everything was all right.

Hineman testified that "[t]hat's the last time I seen him."  Hineman "thought everything was just fine" and nothing unusual had happened, but when he returned after several weeks of working out of town, he did not get an answer when he called.  When he reached Mary, "[s]he was very cold toward me."  Hineman testified that when he inquired:  "[I]s something wrong," she responded, "[W]hy?  Did you do anything?" and he responded:  "[N]o, ma'am, I have never done nothing wrong.  I have always shown kindness and love."  Mary said things were "just fine" and hung up the phone.

¶26    Hineman subsequently e-mailed Mary inquiring as to why Frank would not talk with him, and Mary e-mailed him back with "a list outlining" "some things that they didn't like," such as "I was possessive of [SJS].  I think I was over protective.  I know that.  But I always tried to be there and help."  He added, "[I]t's in the e-mail there."  Hineman subsequently had e-mail contact with "Mary or Frank" and on the Fourth of July he sent SJS a birthday present and a card "with some money in it."  After he sent another card with ten dollars in it, he received it back with Mary indicating she did not want further contact.

¶27    When asked, "Did you at any point touch [SJS] on his penis," Hineman responded, "No, ma'am.  No way.  I would never do anything like that."  Hineman also confirmed that he never punched or kicked SJS and was never kicked out of the home.  Related to the e-mails exchanged between him and Mary after

10

April 1, 2015, he indicated that he was never made aware of any allegations of inappropriate touching of SJS.

¶28 The jury found Hineman guilty, and he was later sentenced. Hineman filed a postconviction motion, which was denied. He appeals.

## *Discussion*

¶29 Hineman contends he is entitled to a new trial because the State failed to turn over the March 12 CPS report prior to trial. He claims this violated his due process rights pursuant to *Brady*. We agree.

¶30 "[T]he suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *State v. Harris*, 2004 WI 64, ¶12, 272 Wis. 2d 80, 680 N.W.2d 737 (quoting *Brady*, 373 U.S. at 87). "[W]e independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468. "A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *Wayerski*, 385 Wis. 2d 344, ¶35.

¶31 In this case, the State concedes the first two components have been met, but challenges whether the March 12 CPS report constitutes "material" evidence. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine

11

confidence in the outcome." *Harris*, 272 Wis. 2d 80, ¶14 (citation omitted). We conclude that the March 12 report constitutes material evidence.

*The State's Case was Not Particularly Strong*

¶32 Ultimately, this case came down to the credibility of SJS and Hineman. To be sure, Hineman did himself no favors by conducting himself in a way that would have raised questions for the jury. Driving by his residence while a police presence was in his driveway and claiming he was "an hour away" when he was really in the immediate vicinity obviously suggested a desire to avoid contact with law enforcement. The potential connection of these actions with any particular interaction he may have had with SJS is a bit weak, however, in light of the fact that he had had no contact with SJS for five months, the alleged assault supposedly had occurred nearly ten months earlier, and the State has identified no evidence suggesting Hineman was aware that SJS's videotaped interview had occurred the day before. Hineman also provided explanations that did not add up as to why SJS might make a sexual assault allegation against him; however, a jury could believe that Hineman may have been convinced of his innocence yet still felt obliged to provide the investigator with some reason for SJS's allegation, without having any real insights as to why SJS might make such a claim.

¶33 But, SJS's trial testimony and videotaped interview were very problematic. After referencing a spanking incident at trial, SJS was asked, "Can you tell me about another time that [Hineman] touched you, [and] you didn't like it?" SJS responded, "I *don't remember what he did* but I know we were on the couch." (Emphasis added.) When asked "[w]hy didn't you feel right [when Hineman touched you]," SJS responded, "I *think* he touched me on my private part." (Emphasis added.) Although SJS responded to the question, it was with uncertainty

over what Hineman "did" and specifically whether his "private part" had been touched. He was not asked, nor did he confirm that he was touched on his private part outside of his clothes as opposed to simply near his private part. As discussed below, without more, SJS's "I think" answer could have provided the jury with reason to question SJS's certainty as to what occurred, especially in light of the inconsistency and incorrectness of so many other details. Furthermore, especially in light of the lack of specific details related to the alleged touching itself, SJS's videotaped interview indicating that Hineman punched him in the arm and kicked him in the belly while they were watching television could leave jurors wondering if SJS and Hineman, who viewed himself as a father-figure to SJS, were just wrestling or "horsing around" innocently and Hineman accidentally made contact with SJS's "private part" or SJS thought he had made such contact.

¶34 The inconsistencies between SJS's videotaped interview and testimony were significant. When asked at trial whether Hineman touched him "one time or more than one time," SJS responded, "once," and he later confirmed again that was "the only time [Hineman] touched [his] private parts." In his videotaped interview, however, SJS indicated that Hineman inappropriately touched him "four times," and later he claimed "six times." When asked in the interview to give detail about another time "that the touching happened," SJS could not do so and responded, "That was all." When asked at trial if Hineman said or did anything or made any sounds when he inappropriately touched SJS, SJS responded, "No"; yet in the videotaped interview, SJS indicated that Hineman "was laughing" at the time.

¶35 SJS claimed at trial that nobody else was in the house at the time of the inappropriate-touching incident on the couch, the touching stopped because SJS "ran into [his] bedroom and closed the door," and nothing "happen[ed] after that."

But in the video, he stated that his *mother*[5] and father were in the house sleeping when the alleged assault occurred, and he woke them and told them of the touching. At trial, SJS indicated on direct examination that he told his father and *grandmother*—not his mother—about the assault, and did so "the same day that it happened," but on cross-examination, he testified that he told them "[a] few weeks after it happened." SJS's grandmother, Mary, testified that SJS never told her that Hineman had inappropriately touched him, adding that if SJS had told her, she "definitely" would have "taken action."

¶36 In his videotaped interview, SJS indicated that he did not believe that the incident happened during the school year, but later said that it occurred during "winter time," which is during the school year. At trial, he testified that it occurred "the day right after trick-or-treating," which is both during the school year and not during "winter time." The investigator testified that children often do not know exact dates of an assault, but "remember times of the year"; yet, here, between his videotaped interview and his trial testimony, SJS was not even consistent as to the time of the year that the alleged assault occurred. Jurors reasonably could question why SJS could recall at the May 10, 2017 trial—two and one-half years after the alleged assault—the significant specificity of the assault occurring "the day right after trick-or-treating," but during his videotaped interview nearly two years earlier—just nine months after the alleged assault—he believed it happened during "winter time" and did not happen during the school year.

¶37 The evidence from the trial could have given the jury the impression that Hineman acted as a father-figure for SJS—buying SJS his first bike and other

---

[5] SJS's biological mother was not living in the home, so we assume SJS is referring to his stepmother.

gifts, taking him trick-or-treating, setting up a bank account for him, etc.—to such an extent that the natural father of SJS, Frank, could have felt an understandable sense of jealousy. Frank's limitations appear to have afforded Hineman an opportunity to step in and supplant Frank in many fatherly ways. Hineman appeared to project an air about him that, as the investigator stated it, "he had raised" SJS and was "the best father figure that he had." Jurors could certainly conclude that Frank, and Mary, had a motive to turn SJS against Hineman.

*March 12 CPS Report was Material*

¶38    The State acknowledges in its response brief that the March 12, 2015 CPS report "had potential impeachment value—and was thus favorable [to Hineman] for ***Brady*** purposes," but contends it was not "material." In light of the lack of strength in the State's case overall, we conclude that the March 12 report was indeed material.

¶39    Had the State turned over the March 12 CPS report to Hineman, it could have made the difference in this case. The investigator's testimony related to the March 12 CPS report significantly and mistakenly indicated to the jury that SJS had disclosed "inappropriate touching" by Hineman to an adult around March 12, 2015, so five months before the videotaped interview and just four months after the alleged touching incident. After being asked if the August 4, 2015 videotaped interview was "the first time that [SJS] says that [Hineman] touched his privates," the investigator told the jury "I believe in the [March 12] CPS report, that there was a statement in there that he said [Hineman] had done that." Even though the investigator indicated some uncertainty, the gist of her entire testimony on this point is summed up by her conclusion related to it: "I believe it does state that [SJS] later says that." As Hineman points out in his brief-in-chief, the March 12 CPS

report actually "contains no such statement." Indeed that report indicates the opposite as it states that the therapist reported "that no information was given by [SJS] that [Hineman] had touched him or forced [SJS] to touch [Hineman]," and the closing portion of the report repeats "[t]here has been no disclosure of maltreatment by the child."

¶40 Defense counsel, however, was unable to impeach the investigator with this important error because the State had not provided the March 12 CPS report to Hineman. The investigator's erroneous testimony no doubt bolstered SJS's credibility and reliability in the eyes of the jury regarding his allegation of a sexual assault by Hineman. Disclosure of the March 12 report to Hineman prior to trial— as the State concedes was required under *Brady*—would have allowed defense counsel to undo such bolstering. And in doing so, counsel also would have weakened, at least to some extent, the credibility and reliability of *other testimony* of the investigator as the jury would likely question her accuracy of recall, objectiveness, and professionalism in the investigation, once she was impeached on such an important detail as this erroneous testimony.

¶41 SJS's comments related to the pen cap incident, telling a classmate it "feels good when someone sucks on your privates," and indicating that Hineman had "told him" this, as well as his meeting with his therapist around this time would have provided an obvious opportunity for SJS to reveal if he had been inappropriately touched by Hineman, yet SJS made no such revelations. Indeed, the statement in the March 12 CPS report "that no information was given by [SJS] that [Hineman] had touched him or forced [SJS] to touch [Hineman]" could have given the jury the impression that the therapist/reporter had specifically asked SJS whether Hineman had inappropriately touched him and that SJS responded in the negative.

16

¶42    The accuracy of SJS's recall of events was clearly in question.  If jurors did not unanimously believe that Hineman sexually assaulted SJS, perhaps because one or more jurors were not convinced beyond a reasonable doubt that Hineman actually touched SJS's "private part"—as SJS initially testified "I *think* he touched me on my private part"—or perhaps because a juror believed that Hineman and SJS had just been wrestling/roughhousing/playing and Hineman accidentally made contact with SJS's "private part," the jury could not have found Hineman guilty.[6]  (Emphasis added.)  As indicated above, the bolstering of SJS's allegation of touching over his clothing could influence how the jury viewed Hineman's behavior as well as the many inconsistencies and unsupported statements made by SJS.  In this close case that turned upon credibility, the bolstering of SJS's accusations by the investigator's erroneous testimony related to the March 12 CPS report may well have made the difference.

¶43    Additionally, pretrial disclosure of the March 12 report likely would have led to Hineman receiving the April 20 and May 29, 2015 CPS reports as well, which also show no accusation by SJS of inappropriate touching by Hineman.  Further, the April 20 report would raise questions as to the thoroughness of the investigator's investigation and provide potential for effective cross-examination of Mary, a State witness, as this report indicated suspicion by Mary and Frank of another possible suspect who could have been abusing SJS as it states: "The reporter [to CPS] has also stated that Grandma [Mary] and Frank have indicated that an

---

[6] As the circuit court instructed the jury, for it to find Hineman guilty, the State needed to prove beyond a reasonable doubt that Hineman had sexual contact with SJS.  To constitute "sexual contact" in this case, the State needed to show, again as the court instructed, that Hineman touched SJS's "penis directly or … through clothing,"  that "it [was] *intentional* touching," and that Hineman "acted with the *intent* to become sexually aroused or gratified."  (Emphasis added.)  *See also* WIS. STAT. § 948.01(5) (2019-20).

autistic son, whose name is not known, may also be the maltreater."[7] This CPS report would provide fertile ground for questioning of the investigator as to whether she reviewed the report during her investigation. If not, how thorough was her investigation? If so, did she ever question Mary or Frank as to why on or around April 20, 2015, Mary and Frank both indicated (apparently to the reporter/nurse) that "an autistic son" could be the person who was "*the* maltreater"? (Emphasis added.) If she did ask, what was each one's answer? If the investigator did not ask Mary and Frank this question, again, how thorough was her investigation? The evidence already indicated that the investigator failed to ever even ask Mary or Frank if SJS had disclosed to them that Hineman inappropriately touched him.

¶44 Without the CPS reports themselves, the jury—like the investigator and videotape interviewer—was focused solely on Hineman. The reports could undermine the thoroughness of the investigation and raise question as to whether SJS's behavior problems were due to a sexual assault, but an assault by someone other than Hineman.

¶45 The State asserts that its failure to turn over the March 12 CPS report to Hineman prior to trial was not material because the *investigator's report* purporting to *summarize* the March 12 CPS report was turned over to Hineman prior to trial and that investigator's report "reproduced the relevant information from the CPS report." The investigator's report was not a substitute for the March 12 CPS report itself.

---

[7] No doubt a desire by Hineman to use this information from the April 20, 2015 report could lead to evidentiary challenges by the State. We make no attempt to divine what such challenges may look like or how the circuit court would rule on them. If such issues arise on remand, they can be addressed by the circuit court. At this point, we only consider potential uses of the April 20, 2015 report and in no way intend to opine on the report's admissibility at a new trial.

¶46 Importantly, the investigator's report was lacking as the investigator testified that she may not have included in her report her belief that the March 12 CPS report included a statement from SJS that Hineman had touched his privates. Indeed, she acknowledged that she would need to see the report to confirm her belief. Moreover, the investigator's report does not identify the relationship to SJS of the person who reported the March 12 information to CPS. The March 12 CPS report, however, indicates the reporter was actually a mental health professional/therapist that SJS was seeing in connection with his behavior problems, not just some random adult, and that this professional had met directly with SJS shortly before contacting CPS. The CPS report, but not the police report, also shows the therapist's concern about SJS's troubling behavior, which included "just ripping his clothes off," as well as her concern that SJS "might be too scared to share some of the information or if anyone had touched him." Unlike the police report, the CPS report indicates that the therapist discussed with SJS his behavior problems that could be connected to his sexual knowledge. The CPS report could suggest to the jury that the therapist may well have asked SJS questions related to his sexual knowledge as well as possible inappropriate touching of SJS by Hineman and that SJS denied that any such touching occurred. Additionally, the police report states generically "no specific information was given on if [Hineman] touched [SJS] or forced [SJS] to touch [Hineman]." The March 12 CPS report, on the other hand, states more clearly that the therapist indicated to the CPS worker making the report "that no information was given *by [SJS]* that [Hineman] had touched him or forced [SJS] to touch [Hineman]." (Emphasis added.)

¶47 Of course, regardless of what was or was not said in the investigator's report, again, the investigator's testimony at trial would have left the jury with the clear impression that she had personally reviewed the March 12 CPS report and that

19

her recollection was that the CPS report contained a statement from SJS that Hineman *had* inappropriately touched SJS, which, of course, is incorrect and misled the jury. And, importantly, as previously discussed, the investigator could not be impeached on this important error without the report itself, and thus, the undermining of the investigator's recall of events related to the investigation and her credibility more generally could not occur without the report itself.

¶48 In its comments at sentencing, the circuit court stated: "The court is bound to accept the verdict. [The t]rial itself was a contest of credibility in many ways. You against the child. *Frankly I thought that the verdict could have gone either way*." (Emphasis added.) Our review of the record supports the circuit court's belief that the trial was "a contest of credibility" and the verdict "could have gone either way." We agree with Hineman's position in his reply brief: "Based on [the investigator's] unimpeached testimony, it is reasonably probable that the jury believed that SJS had reported inappropriate touching as early as March 12. It is reasonably probable this fact tipped the credibility scale in SJS's favor and for that reason, the jury convicted." Our confidence in the verdict is undermined as we believe there is a reasonable probability that had the March 12 report been turned over to Hineman prior to trial, the outcome of the trial would have been different. Due to the ***Brady*** violation, Hineman is entitled to a new trial.

*Therapist Records related to March 12 CPS Report*

¶49 Hineman also contends the circuit court erred in ruling, postconviction, against an in camera review of SJS's counseling and therapy records

20

pursuant to *Shiffra/Green*. We agree with regard to SJS's therapy records related to the March 12 CPS report.[8]

¶50    Whether a defendant has met his or her burden to make a preliminary evidentiary showing sufficient for an in camera review of such records implicates his or her right to a fair trial, and is a matter of law we review de novo. *State v. Green*, 2002 WI 68, ¶¶20, 34, 253 Wis. 2d 356, 646 N.W.2d 298. We consider whether there is at least "a reasonable likelihood that the [therapist's] records" being sought "contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant." *Id.*, ¶34.

¶51    As a mandatory reporter, SJS's therapist was required to report if she suspected that SJS was a victim of abuse. On March 12, 2015, she made such a report. According to the March 12 CPS report, the therapist indicated to CPS that she learned that in the prior week, SJS was observed "going up and down [a pen] cap and slurping while he did this action" and "told a classmate 'feels good when someone sucks on your privates.'" The March 12 report continues:

> Reporter [therapist] indicated that [SJS] stated that he had seen it in a Garfield book. Reporter [therapist] indicated that [SJS] then changed his story when asked further that he had seen it in the movie Garfield 2. Reporter [therapist] indicated that Frank talked to [SJS] about his recent behaviors and also about the incident in school. [SJS] indicated that [Hineman] had told him. Reporter indicated

---

[8] On appeal, Hineman "throws in" a request for records from SJS's school counselor as something of an afterthought or tag-a-long to his request for records from his private therapist. Because he fails to sufficiently develop an argument entitling him to an in camera review of records related to the school counselor, we do not consider this issue. *ABKA Ltd. P'ship v. Board of Rev.*, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ("[We] will not address undeveloped arguments."). Furthermore, neither Hineman nor the record provides any basis for concluding that there is a "reasonable likelihood that [other therapy] records contain relevant information necessary to a determination of guilt or innocence." *Green*, 253 Wis. 2d 356, ¶34.

21

that [Hineman] is a family friend through [SJS]'s mother that Frank has allowed to have continued contact with [SJS]. Reporter [therapist] indicated that no information was given by [SJS] that [Hineman] had touched him or forced [SJS] to touch [Hineman]. Reporter indicated that [SJS] had stated that he saw Garfield sucking on the dog's privates in Garfield 2 the movie. Reporter indicated that there are concerns due to [SJS]'s recent behaviors.… Reporter indicated that Frank is no longer going to allow contact between [Hineman] and [SJS].... Reporter does not know when [Hineman] had told [SJS] about the private parts.

… Reporter indicated that there [are] concerns that [SJS] might be too scared to share some of the information or if anyone had touched him.

… Reporter indicated that [SJS] has also started just ripping his clothes off … [and] is in therapy at this time trying to address his behaviors.

….

… Reporter indicated that since Frank has learned about the statement that [SJS] made and the concern for [Hineman's] behavior around [SJS] he is no longer going to allow contact between [SJS] and [Hineman].

….

There has been no disclosure of maltreatment by the child.

¶52 SJS's therapist obviously contacted CPS out of concern that SJS made this sexual display and comment at school and purportedly learned at least the comment from a "family friend," Hineman. As part of her report to CPS, she indicated that "no information was given by [SJS] that [Hineman] had touched him or forced [SJS] to touch [Hineman]," "there [are] concerns that [SJS] might be too scared to share some of the information or if anyone had touched him," and "[t]here has been no disclosure of maltreatment by the child." SJS was in therapy to address behavior problems such as "ripping his clothes off." In light of the therapist's concerns related to SJS's sexual knowledge and conduct, that SJS may have learned such things from Hineman, and "that [SJS] might be too scared to share some of the

information or if anyone had touched him," we conclude that there is at least "a reasonable likelihood that the [therapists] records" related to her report to CPS on March 12 "contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available" to Hineman. *See Green*, 253 Wis. 2d 356, ¶34. Upon remand of this case for a new trial, Hineman is entitled to an in camera review of the therapist's records related to her report to CPS on March 12.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).