**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 29, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2023AP681**

**STATE OF WISCONSIN**

Cir. Ct. No.  2016ME42

**IN COURT OF APPEALS
DISTRICT II**

---

IN THE MATTER OF THE MENTAL COMMITMENT OF M.A.G.:

OZAUKEE COUNTY DEPARTMENT OF HUMAN SERVICES,

  PETITIONER-RESPONDENT,

 V.

M.A.G.,

  RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Ozaukee County: PAUL V. MALLOY, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] Maeve[2] appeals from orders of the circuit court extending her involuntary commitment under WIS. STAT. ch. 51 and continuing the involuntary administration of medication and treatment. She contends the court erred in entering the orders because Ozaukee County Department of Human Services (County) "fail[ed] to meet its burden of proof by clear and convincing evidence" that she is dangerous to herself or others and that she is not competent to refuse medication. For the following reasons, we disagree and affirm.

## *Background*

¶2 Maeve has been subject to WIS. STAT. ch. 51 mental commitment and involuntary administration of medication orders for years due to her Schizo-affective, bipolar type, disorder. On October 28, 2022, the County filed a petition to extend these orders. The following witnesses presented the following relevant testimony at the November 17, 2022 hearing on the County's petition.

¶3 Samantha Dagenhardt, a psychiatric administrator and advanced practical nurse prescriber for the County, testified that she has master's degrees in psychology and "psych nursing" and is "the outpatient prescriber of psychiatric medications for the Behavioral Health Unit." When counsel for the County inquired if Maeve had any objection to "whether [Dagenhardt] has credentials to testify as to these matters," counsel for Maeve raised no objection.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Maeve is a pseudonym.

¶4      Dagenhardt has worked with Maeve since 2016 and prescribes for her antipsychotic medications—currently injectable Aristada and oral Abilify—on an outpatient basis. When she meets with Maeve, typically "every other month or every three months" with the last meeting being in July 2022, they discuss Maeve's medications. During the July 2022 meeting, Dagenhardt discussed with Maeve symptoms of her illness, including "auditory/visual hallucinations, paranoia, racing thoughts, impulsivity" and concerns "like caring for yourself, showering, just completing activities of daily living." They also discussed advantages of the medications—how they help stabilize her mood, prevent hallucinations, and "that she's been stable [while on] her medication"—and disadvantages of them, noting that Maeve "reports fatigue, and that can be a side-effect of antipsychotic medications, can cause some movement issues, dizziness, nausea, blood sugar, metabolic issues, blood sugar issues, [and] cholesterol [issues]."

¶5      Regarding treatment alternatives, Dagenhardt regularly discusses with Maeve, including discussing at their July meeting, other medications Maeve has tried in the past and the fact that her current ones seem to be the "most effective," "best tolerated," and have the least side effects. Dagenhardt believes Maeve "understands" the advantages and disadvantages of and alternatives to her current medications, but that "having insight into [her] illness is quite a different thing."

¶6      When asked if Maeve "[i]s … able to apply the information to her situation to make an informed choice to accept or refuse the medication," Dagenhardt responded, "[N]o[,] because she doesn't believe that she has a mental illness," and because of this, she believes the medications are not necessary and "have no benefit to her." Dagenhardt added that Maeve is "very convicted in her

belief system as to what's happening, and that it has nothing to do with mental illness, that these [delusions] that she believes are, in fact, reality." Related to Maeve's delusions, or "false belief[s]," Dagenhardt explained:

> There's been longstanding delusions about neighbors shooting lasers. When I first started working with her in 2016, it was because she was living in her car. She was afraid to go … into her apartment because … she believed that her neighbors were … giving her electric shocks in her apartment. So she wasn't going into her apartment … and, instead, [was] living in her vehicle.
>
> She has quite chronic, fixed, grandiose delusions about being part of the government, being called to Washington D.C.… And she believes that these things are true.

¶7      When asked if there has been "any improvement" for Maeve since she started meeting with and prescribing medications to Maeve, Dagenhardt responded, "[S]he's been stable. She's been safe." Dagenhardt testified that while some of Maeve's delusions "are fixed" and likely will not change with medication, "as far as her stability, … mood, safety, caring for herself, I believe that those things have been stable." She added that these things have improved for Maeve since she has been treating her, adding, "For example, she's living in her apartment now. She's no longer living in her vehicle." According to Dagenhardt, Maeve "[a]bsolutely" remains treatable for her mental illness.

¶8      Dagenhardt confirmed that she continues to witness Maeve's delusions when she meets with her, adding that Maeve leaves her voicemails "pretty regularly," including one claiming "[t]hat … a judge … no longer approves of this commitment, that she no longer needs to be on the medication I'm prescribing for her, that she's under the care of a different doctor." Maeve "talks very frequently about the neighbors and the lasers that cause her physical pain." Dagenhardt has "talked to [Maeve's] … primary care physician, who believes she

has arthritis pain, but [Maeve] believes that she has pain from the lasers being shot at her in her apartment by the neighbors." When asked if there was a substantial probability that Maeve requires psychotropic medication "to prevent deterioration at this time," Dagenhardt responded, "Absolutely. And … I believe she would not take it … voluntarily" again "because she doesn't believe it's necessary." When asked if Maeve "[h]as … specifically voiced an objection to taking it, or … just indicated she doesn't believe it's necessary," Dagenhardt responded, "Both," providing an example of Maeve objecting to and refusing to receive her injection from the County nurse in April or May 2022. This refusal prompted Dagenhardt to visit Maeve in July 2022, at which time Dagenhardt was able to persuade her to receive the injection. Dagenhardt believes Maeve has continued receiving the injection since then.

¶9 When asked "if [Maeve] did not receive treatment through a commitment, do you believe … there's a substantial probability she'd lack services necessary for her health and safety, at this time," Dagenhardt responded,

> Yes. … I mean, she receives case management services ["through the commitment order"], somebody coming in to check on her and make sure that she's taking her meds several days a week.
>
> She's med-monitored at this point, and just to check on her apartment. She has a history of having rotted food when she wasn't caring for herself; so there is somebody that has—and my nurse, also, again goes to her apartment to, kind of, check on her and can, kind of, eyeball what's going on at the apartment.

When asked if Maeve would suffer either severe mental, emotional or physical harm "[i]f she were to deteriorate," Dagenhardt responded,

> I would worry about, again, that—her diet, just because she has a history of having the rotten food in her apartment. I worry about her drinking adequate fluids, going to

> appointments [with] her physician … [for] her primary care needs. I worry about … her caring for herself with her hygiene.
>
> I … would worry about, would she continue to live in her apartment out of fear of her neighbors, again, and then end up living in her vehicle again, as she's done in the past. And she has these chronic persecutory and grandiose delusions; so I would worry very much about both her mental and physical health.

Dagenhardt added, "[W]hen you go for periods of time without treatment, it can be really hard to return somebody back to their baseline of stability after they have a gap in their medication treatment." She agreed she had a "substantial concern" that without the medication, Maeve would revert to her prior condition and "suffer severe mental and physical harm." She also agreed that "at the time [Maeve] was placed under commitment, she was not able to function independently in the community" and was "living in her car, putting herself at risk." She agreed Maeve "might move into her car again or leave her residence again," adding the concern that "we're heading into winter."

¶10 When asked if she had "any evidence that [Maeve] would avail herself of treatment [or] services in the community on her own if not under commitment," Dagenhardt responded, "[S]he's voiced many times that the medication is not necessary; so I don't think she would seek out any provider." When asked if Maeve had the competency to make "her own decisions in life," Dagenhardt responded,

> I think she's done well with support. Again, we do have somebody coming in from the County as a case manager … several days a week. I know she has family support. My nurse … is there regularly to give her her injection. I check in on her. So, independently, I would be concerned about her … activities of daily living, just her meeting her basic needs, but she does have a lot of support from us; … I think she needs that.

¶11 On cross examination, Dagenhardt agreed that Maeve "may" avail herself of nonmedication support services offered by the County even if she was not under commitment, but added that it was "hard to say." "She may continue to allow [her case manager] to check on her, but I think [Maeve] would prefer her family play that role because I think she sees anybody from the County [as] linked to me and Mary, the nurse, and the medication, which is a very stressful thing for her." Dagenhardt reiterated her opinion that

> as far as her medications go, she doesn't have insight into her mental illness, and I believe that she would really decompensate without the medication and then not be able to make [life] decisions. So, right now, I think she's able to live with the support she has because she's on the medication.

Dagenhardt again expressed concern that Maeve would not "be able to take care of herself" if she was not on the medication. When asked, "other than the medication, is there treatment that would assist [Maeve] to be able to live on her own," Dagenhardt responded,

> There's … supportive services, caregivers that can come in as far as meeting … her basic needs, like, eating, sleeping arrangements of housing, all of that, but if—if she's not stable and then refuse[s]—'[c]ause, in 2016, she had an apartment that was available to her, but she chose to live in her vehicle anyway.
>
> So, again … [w]hen she's on the medication, things are stable, and she's safe and able to accept the support services that are necessary for her with her mobility and mental health.

When asked if the medication could be "replace[d]" with some other therapy, Dagenhardt responded, "Well, we have psychotherapy available to her. She has declined that." Dagenhardt added, "[B]ut psychotherapy isn't going to change the

chemical imbalance in the brain; so nothing—nothing is comparable to medication … for this situation."

¶12     When asked about delusions in the past year, Dagenhardt stated that Maeve "still is referring to" her neighbors shooting her with lasers in her apartment.  Also, "[s]he still believes that she's been summoned to Washington D.C. to be part of a government project.  She's part of the government in some capacity."

¶13     In questioning by the circuit court, Dagenhardt discussed a recent concern about cellulitis in Maeve's leg, expressing that Maeve left her a voicemail for help in which she referred to it as elephantiasis and attributed the condition to her medication.  Dagenhardt also confirmed that a report indicated that in 2015, before Maeve started treatment with her, "there was a call from … authorities in—in Washington D.C., where [Maeve] had called indicating something about killing someone and killing the President, and they actually followed up."  Referencing a police report, Dagenhardt also confirmed an incident in October 2022 in which Maeve called a local pharmacy and ordered prescription medication for a neighbor.

¶14     Dagenhardt confirmed for the court her belief that because Maeve does not believe she has a mental illness, she likely would not take her medication voluntarily and then "in the not too distant future," she would decompensate and return to "where she was."  Dagenhardt then added, "And then it makes it harder

to return her to a stable state," explaining that "[t]he brain … doesn't bounce back as well with each subsequent gap in treatment."[3]

¶15     On re-direct examination, Dagenhardt testified that while she could not recall if she had specifically mentioned psychotherapy as an option for Maeve in July, she had offered that to her "probably 12 to 15 times," agreeing that Maeve has "always declined it."   She believed psychotherapy could potentially help Maeve cope with her delusions.

¶16     On re-cross-examination, Dagenhardt confirmed that elephantiasis is "a swelling or enlargement of an area of the body."   During further questioning regarding Maeve's leg condition, Maeve interjected, "It's worms in the leg, why it was swollen and red …."

¶17     Sarah Miller, a County crisis case manager, testified next.   When asked for "any recent evidence of concern that [Maeve] remains dangerous to herself or others," Miller referred to the recent situation in which Maeve's leg was swollen.   Maeve believed the swelling was "due to the lasers in the apartment" and that she did not need to seek treatment for it.   It took "multiple parties" to convince Maeve before she finally allowed her daughter to take her for treatment.

¶18     When asked for evidence that Maeve "has engaged in dangerous acts towards others," Miller referred to the incident in which Maeve called in a prescription for someone "that was not meant for them" without the person's permission.   Miller noted that the "individual did ingest those medications," which

---

[3] Dagenhardt added, "[A]nd that's been shown many, many times with research.  And in my own clinical experience it's harder to return people to baseline when they go on and off their medication."

was "pretty serious" to her. Miller stated that both the cellulitis and prescription situations occurred just weeks prior to the hearing.

¶19 Miller testified that Maeve is assisted with in-home services "more than half [of which] are through the County, with County staff and funds and oversight." She is also assisted with a community-based service, known as Family Care, "that does things like laundry and grocery shopping and meal preparation." Miller agreed, however, that staff who attempt to assist Maeve are "not always able to accomplish what they need to when they go" to her home because "she continues to get paranoid with the staff." Miller testified that consistent with Maeve's requirements for living in the community while under commitment, a case worker meets with Maeve three times per week. Miller added, "[B]ecause she wouldn't engage in therapy or work[] on her coping skills, we have to ensure, by any means, that she's safe, and she's … taking care of herself."

¶20 Maeve also testified. She stated she had not previously "lived" in her car but had fallen asleep in a car one night and a policeman believed she was living in the car because she "had so much in my car, because my things were being stolen from my home." Regarding the prescription she called into the pharmacy, she stated she "should have made it clear that [the person] wanted a prescription." She acknowledged the person she had called the prescription in for "went to the police department to get me in trouble." She indicated that because of that incident, she no longer wants to help people, adding, "I've had two people since then say that they had gangrene."

¶21 Following the testimony, the circuit court ordered the extension of Maeve's commitment and the continued involuntary administration of medication. Maeve appeals.

### *Discussion*

¶22   An individual is a proper subject for a recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See **Langlade County v. D.J.W.***, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(13)(e).   We do not disturb a circuit court's findings of fact unless they are clearly erroneous, and we accept all reasonable inferences from those facts.   ***Outagamie County v. Melanie L.***, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607.   Maeve does not dispute the circuit court's conclusions that she is mentally ill and a proper subject for treatment.   She insists, however, the court erred in concluding the County met its burden to prove she is dangerous.   Maeve also claims the court erred in concluding the County met its burden under WIS. STAT. § 51.61(1)(g)4. to prove by clear and convincing evidence that she is incompetent to refuse medication.   *See* WIS. STAT. § 51.20(13)(e).   "In evaluating whether the County met its burden of proof, a court must apply facts to the statutory standard in ... § 51.61(1)(g)4.b. and interpret the statute.   Applying facts to the standard and interpreting the statute are questions of law that this court reviews independently."   *Melanie L.*, 349 Wis. 2d 148, ¶39.

Dangerousness

¶23   Following the hearing on the petition, the circuit court concluded the County had established Maeve's dangerousness to herself and/or others under subd. paras. c., d. and e. of WIS. STAT. § 51.20(1)(a)2.   Because the County only needed to prove her dangerous under one of the § 51.20(1)(a)2. standards and we

11

conclude it proved her dangerous under subd. para. c., we focus solely on that provision.[4]

¶24    Under WIS. STAT. § 51.20(1)(a)2.c., the County was required to show, as relevant here, that Maeve "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to … herself or other individuals."  Maeve does not dispute the evidence demonstrated her judgment is sufficiently impaired; instead, she claims the County failed to sufficiently show a substantial probability of physical impairment or injury to herself or others.  We think the County sufficiently showed this.

¶25    Maeve was seventy-eight years old at the time of the hearing.  The evidence showed that in 2016, she was living out of her car because she believed her neighbors were "shooting lasers" at her and "giving her electric shocks in her apartment," all of which led to her initial commitment.  Once Dagenhardt began treating and medicating her, Maeve was able to live in her apartment again.  Dagenhardt testified that Maeve "still is referring to" and "very frequently" talks about her neighbors shooting lasers at her, which she believes is "caus[ing] her physical pain."  Dagenhardt voiced her concern that without the medication, Maeve would decompensate and "might move into her car again or leave her residence again … and we're heading into winter."

---

[4] The circuit court entered an order finding Maeve dangerous under WIS. STAT. § 51.20(1)(a)2.c. and d. and an order finding her dangerous under § 51.20(1)(a)2.e.  Although entered as separate orders, we consider these two orders as a single order finding Maeve dangerous under § 51.20.

¶26    The evidence also indicated Maeve had a swollen leg for which she was not receiving medical attention because she believed the swelling was caused by neighbors shooting lasers into her apartment (or caused by her prescribed medication).  She only agreed to get medical help after "multiple parties" persuaded her to seek it.  Dagenhardt also testified that Maeve "has a history of having rotted food" in her apartment.  Additionally, in 2015, before Maeve started treatment with Dagenhardt, Maeve "had called indicating something about killing someone and killing the President," and authorities from Washington D.C. "actually followed up."  The evidence also indicated Maeve had recently called a pharmacy to secure prescription medication for a neighbor, which the neighbor ingested.  The neighbor later called the police on Maeve because of this incident.

¶27    Maeve has strong delusions, which lead to irrational and often dangerous actions or inactions to herself or others.  Not seeking medical care for a swollen leg and abandoning her apartment for her car—both due to a belief neighbors were shooting lasers at her in her apartment—keeping rotten food, and illegally prescribing medication for someone (who then ingests it) are examples of this.  The circuit court stated that whether Maeve engages in these same particular dangerous acts again or dangerous acts of a different nature, it's her "impaired judgment" that is dangerous to herself and others.  We agree.  The court did not err in concluding Maeve's grossly impaired judgment creates a "substantial probability of physical impairment or injury to … herself or other individuals."

¶28    Maeve notes that under WIS. STAT. § 51.20(1)(a)2.c., "there is an exception" that provides that "[t]he probability of physical impairment or injury is not substantial under this subd. 2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services."  We

need not address this exception because Maeve has failed to sufficiently develop an argument related to it. *See* ***ABKA Ltd. P'ship v. Board of Rev.***, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ("This court will not address undeveloped arguments."). That said, we nonetheless conclude it does not apply here because the evidence did not show a reasonable probability Maeve would avail herself of services available for her protection.

¶29 The circuit court found that without the commitment and involuntary medication order, Maeve would not avail herself "of the services that allow you to do what you're capable of doing today." The court's related finding that Maeve would not take medication because she does not believe she has a mental illness was strongly supported by Dagenhardt's testimony. Dagenhardt further testified that she had offered Maeve psychotherapy as a treatment option "probably 12 to 15 times," but she "always declined it."

¶30 Additionally, Miller testified that even after Maeve's swollen leg was brought to Maeve's attention, it took "multiple parties" to convince her she should seek medical attention. Miller also informed the circuit court that because of the commitment order, Maeve receives significant support and assistance throughout the week from County staff who come to her residence; however, because Maeve "continues to get paranoid with the staff," they are "not always able to accomplish what they need to when they go" to her home. Indeed, it was through staff visitation that the County became aware of the rotten food in

Maeve's apartment and her swollen leg. The court's finding that Maeve would not likely avail herself of necessary services was not clearly erroneous.[5]

¶31    We conclude the court did not err in determining that the County had met its burden to prove that due to her grossly impaired judgement, Maeve presented a danger to herself and/or others.

The Involuntary Medication Order

¶32    Maeve challenges the involuntary administration of medication order on the basis that (1) no physician testified for the County at the hearing, (2) "[t]he competency evaluation was untimely and lacked specificity," and (3) "[t]he circuit court failed to apply the correct legal standard." We reject each challenge.

*No physician testimony*

¶33    Maeve presents her challenge to the involuntary medication order based upon the lack of physician testimony as one of insufficient evidence being presented by the County at the hearing. In truth, this issue really is one of statutory interpretation and application—whether the statute she relies upon, WIS. STAT. § 51.61(1)(g)3., requires physician testimony for the entry of an involuntary medication order. Because Maeve failed to raise this issue before the circuit court, we deem it forfeited. *See* **Waukesha County v. S.L.L.**, 2019 WI 66, ¶42, 387 Wis. 2d 333, 929 N.W.2d 140 (concluding that a WIS. STAT. ch. 51 committee

---

[5] Maeve asserts that "[e]ven without the commitment, [she] could continue to receive" in-home services. We note that WIS. STAT. § 51.20(1)(a)2.c. states that "[f]ood, shelter or other care provided to an individual who is substantially incapable of obtaining the care for himself or herself, *by a person other than a treatment facility*, does not constitute reasonable provision for the subject individual's protection available in the community under this subd. 2.c." (Emphasis added.) Maeve makes no attempt to address this language.

forfeited her sufficiency of the evidence claim because she did not raise an objection on that basis before the circuit court). Additionally, we also decline to address this issue because it is insufficiently developed. *See ABKA Ltd. P'ship*, 231 Wis. 2d at 349 n.9.

¶34 As our Supreme Court has stated,

[t]he [forfeiture] rule is not merely a technicality or a rule of convenience; it is an essential principle of the orderly administration of justice. The rule promotes both efficiency and fairness, and "go[es] to the heart of the common law tradition and the adversary system."

The [forfeiture] rule serves several important objectives. Raising issues at the trial court level allows the trial court to correct or avoid the alleged error in the first place, eliminating the need for appeal. It also gives both parties and the trial judge notice of the issue and a fair opportunity to address the objection. Furthermore, the [forfeiture] rule encourages attorneys to diligently prepare for and conduct trials. Finally, the rule prevents attorneys from "sandbagging" errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal. For all of these reasons, the waiver rule is essential to the efficient and fair conduct of our adversary system of justice.

*State v. Huebner*, 2000 WI 59, ¶¶11-12, 235 Wis. 2d 486, 611 N.W.2d 727 (third alteration in original; citations omitted).

¶35 At no time while this matter was before the circuit court did Maeve raise the issue she now raises on appeal. She could have asked that the petition be dismissed prior to the hearing due to the lack of the physician endorsement she now claims is statutorily mandated; but she did not. She could have moved for dismissal at the close of the County's case-in-chief on this same basis; but she did not. Additionally, at the start of the hearing, the County specifically asked if

Maeve had any objection to "whether [Dagenhardt] has credentials to testify as to these matters," and counsel for Maeve raised no objection.

¶36 Despite Maeve's forfeiture and failure to sufficiently develop this issue, we nonetheless state the following. The relevant portion of WIS. STAT. § 51.61(1)(g)3. that Maeve hangs her hat on states:

> A report, *if any*, on which the motion [for the involuntary administration of medication and treatment] is based shall accompany the motion and notice of motion and shall include a statement signed by a licensed physician that asserts that the subject individual needs medication or treatment and that the individual is not competent to refuse medication or treatment, based on an examination of the individual by a licensed physician.

(Emphasis added.) Maeve's assertion on appeal is not that the County's petition for the involuntary administration of medication to Maeve was itself invalid due to the lack of a statement signed by a licensed physician, but that the evidence presented at the hearing was insufficient because a physician did not testify. This is a different matter than what is addressed in WIS. STAT. § 51.61(1)(g)3., which addresses the submission of a report with the motion. Moreover, although a report was submitted with the "motion" (here a petition) and was lacking a physician statement and signature, there is reason to question if a report is required at all under this statutory provision in light of the legislature's inclusion of the words "if any." And without this provision in any way specifically addressing a requirement for physician testimony at the hearing on the petition, there is even more reason to question whether the failure to include such a report—or physician testimony— means the County did not meet its burden of proof with regard to the medication order. Maeve insufficiently develops this issue in part because she makes no attempt whatsoever to explain how the language of this provision means evidence presented by the County at the hearing on the medication petition is, by law,

insufficient if no physician testifies. In essence, her brief is conclusory with regard to this important issue. *See Associates Fin. Servs. Co. of Wis. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (declining to address conclusory and undeveloped arguments); *see also State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

*Timing and Specificity*

¶37     Maeve also asserts the circuit court erred in entering its medication order because the medication discussion Dagenhardt had with Maeve occurred four months before the recommitment hearing. She claims, without legal support, that this was "not completed at an appropriate time." We disagree. Unless the nature of the medications or their impact on Maeve had changed in that four-month period—and we see no evidence in the record of either—four months before the recommitment hearing was not "untimely." Moreover, we note that Dagenhardt had been Maeve's treatment provider since 2016 and testified that she regularly discussed treatment, including medications, with Maeve. The medication-related discussion Dagenhardt had with Maeve in July 2022, four months before the hearing, was a continuation of prior discussions. Under the circumstances here, Dagenhardt's medication discussion with Maeve was sufficiently timely.

¶38     Maeve also contends "the evidence regarding [her] alleged inability to apply an understanding of the advantages, disadvantages, and alternatives to medication lacked specificity." She asserts that "[t]he County's evidence showed at most that [Maeve] did not believe that she was mentally ill, and did not believe that medication was necessary." She claims the County failed to sufficiently show

that Maeve would not take medication without an involuntary medication order in place.

¶39 First, Dagenhardt clearly testified to having regular discussions with Maeve regarding her current medications and those that have not worked so well for her in the past. Dagenhardt detailed the type of discussions she had with Maeve regarding the advantages and disadvantages: She and Maeve discussed the symptoms of Maeve's illness, including "auditory/visual hallucinations, paranoia, racing thoughts, impulsivity," and concerns "like caring for yourself, showering, just completing activities of daily living;" the fact that the medications help stabilize Maeve's mood, prevent hallucinations, and "that she's been stable with her medication;" and Maeve's "reports [of] fatigue," "movement issues, dizziness, nausea, blood sugar, metabolic issues, blood sugar issues, [and] cholesterol [issues]." Dagenhardt also testified that she had offered psychotherapy to Maeve as an option at least a dozen times, but Maeve always rejected that option.

¶40 Regarding Maeve's willingness, or lack thereof, to take the medication without an involuntary medication order, the County responds by pointing out that the circuit court here found, as it stated, Maeve "do[es]n't believe [she] ha[s] a mental illness"; as a result, it concluded Maeve "would [not] avail [her]self of the services[, including psychotropic medication] that allow [her] to do what [she is] capable of doing today." The court's finding is supported by the evidence presented at the hearing.

¶41 As the County points out, Dagenhardt testified that Maeve had "refused her injection," in April or May 2022; had "voiced many times that the medication is not necessary"; and does not believe she has a mental illness. Dagenhardt expressed her understandable concern that Maeve would not seek out

a provider for medication if the order for involuntary medication was not extended. Maeve herself testified to her belief that one of her prescribed medications "cause[d] pain in [her] legs." Such a belief would also create incentive for Maeve to not voluntarily continue with medication.

¶42 The evidence sufficiently showed that Maeve had the advantages and disadvantages of and alternatives to accepting the particular medication explained to her and is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to ... her mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment." *See* WIS. STAT. § 51.61(1)(g)4.b.

*Legal Standard*

¶43 Finally, Maeve asserts the circuit court applied an incorrect legal standard because "[t]he court found that [Maeve] lacked 'ability to take that understanding and process that … *in a positive manner that allows [her] to benefit* from that.'" She then adds that "[t]he question is not whether [she] would benefit from a course of treatment. It is whether she possessed the ability to give informed consent, regardless of whether other people believed that it was to her advantage or benefit."

¶44 The County responds by showing how Maeve has incorrectly interpreted the circuit court's comments, specifically noting the words Maeve chose to italicize and those she did not. The County explains, correctly, that in using the word "benefit," "the circuit court was referring to Maeve's ability to benefit from her understanding of the medication in terms of making the choice to accept medication. The circuit court was not commenting on whether Maeve would [physically] benefit from the medication." The County adds that the

"court's statement of the standard is not materially different from [WIS. STAT. §] 51.61(1)(g)4.b. Maeve's inability to benefit from her understanding of the medication is arguably an alternative way of saying she is unable to apply an understanding of the medication." We agree.

¶45 As our supreme court stated in *Melanie L.*, 349 Wis. 2d 148, ¶71, the WIS. STAT. § 51.61(1)(g)4.b. standard essentially means the person is substantially incapable of "*mak[ing] a connection between* an expressed understanding of the benefits and risks of medication and the person's own mental illness." That is essentially what the circuit court was saying with the quote Maeve criticizes. Additionally, the court told Maeve it recognized she was "bright enough to verbalize an understanding of medications, … and you could explain to me how these medications work, … but the problem is, you don't see a need for them because you don't believe you have a mental illness." It makes sense that Maeve is unable to "make a connection between an expressed understanding of the benefits and risks of medication and [her] own mental illness" if she does not believe she has a mental illness. We agree with the County that the circuit court ultimately applied the correct standard in making its determination.[6]

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[6] Given our opinion entered in this case, we deny the County's motion to strike, which we held in abeyance.